[Civ. No. 34281. Second Dist., Div. Five. Sept. 3, 1970.]

CLEVELAND CHIROPRACTIC COLLEGE,
Plaintiff and Respondent, v.
STATE BOARD OF CHIROPRACTIC EXAMINERS,
Defendant and Appellant.

26

## COUNSEL

Thomas C. Lynch, Attorney General, Michael J. Smolen and Robert J. Polis, Deputy Attorneys General, for Defendant and Appellant.

Richards, Watson & Hemmerling, Richard Richards and Robert N. Joehnck for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—This is an appeal by the State Board of Chiropractic Examiners, (hereinafter the Board) from a judgment of the Superior Court of Los Angeles County granting a writ of mandate. The writ was sought by Cleveland Chiropractic College (hereinafter Cleveland) to have the court order the Board to set aside its decision of March 19, 1968, which withdrew approval of Cleveland as an approved school of chiropractic in the State of California.

A brief chronology of the pertinent events follows: In November and December of 1965, representatives of the Board made an inspection of Cleveland. Thereafter, on April 15, 1966, the Board sent Cleveland a letter listing 14 areas in which Cleveland allegedly did not meet the standards required by the rules and regulations of the Board for approved schools. The list was designated as a "Bill of Particulars," and Cleveland was given six months within which to correct the alleged deficiencies. After a subsequent inspection by a three-man team consisting of Drs. Poulsen, Loyst, and Gohl, the Board sent Cleveland a letter dated November 14, 1966, stating that 10 of the 14 deficiencies listed in the April 15, 1966 letter had not been corrected. The letter further stated that Cleveland would be removed from the list of approved chiropractic schools effective January 9, 1967, unless it could present evidence that it had corrected the listed deficiencies by that date.

At a meeting of the Board held on January 10, 1967, Cleveland submitted a letter in which it purported to set forth the manner in which it was complying with each of the Board's complaints. At the conclusion of the meeting Cleveland was asked to submit a progress report to the Board in 30 days, and a meeting on March 14, 1967 was agreed upon.

At the March 14, 1967 meeting, Cleveland offered some documents to show its purported compliance with the Board's rules. On March 29, 1967, the Board advised Cleveland by letter that it had decided not to take any action at that time concerning the removal of certification of Cleveland as an approved school. The "decision was made in order that [Cleveland] might have more time to bring itself into compliance with the rules of the Board." Cleveland was directed to submit monthly progress reports to the Board.

On November 24, 1967, a document entitled "Statement of Causes for Removal from List of Approved Schools," together with a notice of hearing, was filed with the Board and served on Cleveland. The statement of causes specified in detail the reasons which the Board believed justified Cleveland's removal. The hearing was held on January 3, 4, and 5, 1968, and oral arguments of counsel were made on March 18, 1968. On March 19, 1968, the Board found that Cleveland was not in compliance with 16 specified sections of its rules and ordered that Cleveland be removed from the list of approved schools.

In the court below, the judge found that, with two exceptions, Cleveland was either in compliance with the Board's rules or the rule it was violating was invalid.

Section 331.1(a)[1] of the Board's rules provides that an approved school must be a nonprofit corporation. Section 331.3(a) provides that the Board of Trustees of an approved school must be composed of persons who receive no financial benefits from the operation of the school. The court found that while Cleveland was in violation of these rules, they did not bear any reasonable relation to the performance or nonperformance of a chiropractic college in providing an education for its students and were arbitrary. Additionally, the court found that there is no authorization in the Chiropractic Act[2] for the promulgation of either of these two rules and that they therefore exceeded the scope of the jurisdiction conferred upon the Board by that act. Finally, the court found that since Cleveland, through its predecessor in interest, has been a chiropractic college organized for profit since 1911, antedating the rules in question, the promulgation and enforcement of these rules against Cleveland would effectively deprive it of valuable property rights without due process of law.

Section 4 of the Chiropractic Act provides in pertinent part:

"The board shall have power:

". . . . . . . . . . . . . . . . . . . .

"(b) To adopt from time to time such rules and regulations as the board may deem proper and necessary for the performance of its work, copies of such rules and regulations to be filed with the Secretary of State for public inspection."

"(e) To do any and all things necessary or incidental to the exercise of the powers and duties herein granted or imposed."

"(f) To determine minimum requirements for teachers in chiropractic schools and colleges."

"(g) To approve chiropractic schools and colleges whose graduates may apply for licenses in this State. Any school meeting the requirements of Section 5 of this act and the rules and regulations adopted by the board shall be eligible for such approval."

Section 5 of the Chiropractic Act provides in pertinent part: "It shall be unlawful for any person to practice chiropractic in this State without

---

[1]Unless otherwise indicated, all citations are to Administrative Code, title 16, chapter 4.

[2]In West's Annotated Business and Professions Code, each section of the Chiropractic Act is proceeded by the number 1000. In Deering's Annotated Business and Professions Code the Chiropractic Act [Stats. 1923, p. lxxxviii; Deering's Gen. Laws, 1954, Act 4811, p. 232] is included as an appendix to the code.

a license so to do. . . . Except in the cases herein otherwise prescribed, each applicant shall be a graduate of an approved chiropractic school or college which teaches a course of not less than 4,000 hours, extended over a period of four school terms of at least nine months each, and shall present to the board at the time of making such application a diploma from a high school, or proof, satisfactory to the board, of education equivalent in training to a high school course."

The Board argues that rules 331.1(a) and 331.3(a) are necessary and proper for the performance of its work. It contends that rule 331.1(a) is justified because organization as a nonprofit corporation is the mark of a serious professional school. It further contends that a nonprofit corporation might be more willing to make sacrifices and contributions of its capital in order to provide improvements in the school. Finally, since a nonprofit corporation can solicit tax-free donations, the Board argues that compliance with rule 331.1(a) would create a greater ability to raise money for educational purposes. The Board contends that rule 331.3(a), requiring that the board of trustees of a chiropractic college be composed of disinterested individuals who receive no compensation from the school, is necessary to prevent evasion of the requirements of rule 331.1(a). In the absence of rule 331.3(a), argues the Board, a sole owner could organize his school as a nonprofit corporation and take out the profits in the form of salary.

We need not decide whether rules 331.1(a) and 331.3(a) constitute arbitrary and unreasonable exercises of the rule-making power granted the Board in section 4 of the Chiropractic Act. Even if these rules would otherwise be reasonable, we find that, in light of certain general constitutional and statutory provisions, these administrative regulations are beyond the Board's power and therefore invalid. Article XII, section 1 of the California Constitution grants the Legislature power to regulate corporations: "The Legislature shall have power, by general laws and not otherwise, to provide for the formation, organization and regulation of corporations and to prescribe their powers, rights, duties and liabilities and the powers, rights, duties and liabilities of their officers and stockholders or members. All laws now in force in this State concerning corporations and all laws that may be hereafter passed pursuant to this section may be altered from time to time or repealed."

Pursuant to this constitutional grant of power, the Legislature enacted Education Code section 29005, permitting the organization of private educational institutions as profitmaking corporations:

"(a) If a corporation formed pursuant to this article (commencing at

section 29001) is to be authorized to issue shares of stock, the articles of incorporation shall state the total number of shares which the corporation shall have authority to issue and (1) the aggregate par value, if any, of all shares, and the par value of each of the shares, or (2) a statement that all the shares are to be without par value and except as herein provided shall be treated for all purposes as being incorporated pursuant to Division 1 (commencing with Section 300) of Title 1 of the Corporations Code.

"(b) If a corporation formed pursuant to this article (commencing at Section 29001) is to be authorized as a nonprofit corporation without authority to issue shares of stock, the articles of incorporation shall so state and except as herein provided, such corporation shall be treated for all purposes as being incorporated pursuant to Part 1 (embracing Sections 9000 to 9802, inclusive) of Division 2 of Title 1 of the Corporations Code and shall have the general powers granted by Section 10206 of the Corporations Code."

█ An administrative agency may not promulgate a rule or regulation that alters or enlarges the terms of a legislative enactment. (*Whitcomb Hotel, Inc.* v. *California Employment Com.,* 24 Cal.2d 753 [151 P.2d 233, 155 A.L.R. 405].) As the court stated in *Tolman* v. *Underhill,* 39 Cal.2d 708 at p. 712 [249 P.2d 280]): █ "It is well settled, however, that [the] laws passed by the Legislature under its general police power will prevail over regulations made by [an agency] with regard to matters which are not exclusively [the agency's] affairs." (See also *Carter* v. *Seaboard Finance Co.,* 33 Cal.2d 564, 585 [203 P.2d 758]; *In re Potter,* 164 Cal. 735 [130 P. 721]; *County of L.A.* v. *State Dept. Pub. Health,* 158 Cal.App.2d 425, 437 [322 P.2d 968]; Annot., 155 A.L.R. 411.) █ Since sections 331.1(a) and 331.3(a) conflict with Education Code section 29005, they are invalid.

█ The court below found that section 331.4(c), which requires the furnishing of a budget and status report to the trustees of the college, is an arbitrary interference with the internal procedures of the college and is invalid. In its memorandum opinion, the court also held that this requirement is only applicable to schools with a nonprofit corporate structure. █ While the Board certainly has power to enact reasonable rules concerning the conduct of approved schools, (*Hunt* v. *Board of Chiropractic Examiners,* 87 Cal.App.2d 98 [196 P.2d 77]), it cannot, as an administrative body, unreasonably and arbitrarily interfere with the internal management of such schools. (See *Pac. Tel. & Tel. Co.* v. *Public Utilities Com.,* 34 Cal.2d 822 [215 P.2d 441], where the court held

that the Public Utilities Commission could not prescribe the terms upon which a telephone company could contract with its controlling parent company. "The determination of what is reasonable in conducting the business of [the] utility is the primary responsibility of management. . . .") (See also *First Industrial Loan Co.* v. *Daugherty,* 26 Cal.2d 545, 550 [159 P.2d 921].)

It would seem that in the course of assuring itself that approved schools are providing their students with an adequate education, the Board could reasonably require disclosure of a school's financial status, in order to determine if the school is financially equipped to provide a proper education. Section 331.5, which requires an approved school to annually furnish the Board with balance sheets and profit and loss statements, was properly adopted for this purpose. However, to require the dean and business manager to prepare budgets for the approval of the college trustees and report to the trustees from time to time on the status of the budget may, depending on the organization of the college, result in the needless expenditure of bureaucratic time and energy. This is especially true in the case of Cleveland, where both the president and the dean are members of the board of trustees. Section 331.4(c) therefore is not reasonably related to the Board's function of approving chiropractic schools and colleges and constitutes an arbitrary interference with Cleveland's internal operations. (See also *Boreta Enterprises, Inc.,* v. *Department of Alcoholic Beverage Control,* 2 Cal.3d 85 [84 Cal.Rptr. 113, 465 P.2d 1].)

Before considering whether the court below correctly determined that Cleveland was in compliance with those regulations of the Board which the court found were valid, we must consider whether the court was correct in applying the "independent judgment" test in reviewing the evidence. Code of Civil Procedure section 1094.5, governing administrative mandamus, establishes two basic tests for a trial court to determine if the evidence supports a board's findings:

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

Under the "independent judgment" test, the court must weigh the evidence and exercise its independent judgment on the facts. (*Drummey*

v. *State Board of Funeral Directors & Embalmers*, 13 Cal.2d 75, 84 [87 P.2d 848].) Under the substantial evidence test, the court must isolate and consider only the evidence supporting the administrative decision. (*Beverly Hills Fed. S. & L. Assn.* v. *Superior Court*, 259 Cal.App.2d 306 [66 Cal.Rptr. 183].) ▋ The court must exercise the independent judgment test when reviewing the administrative decisions of nonconstitutional state-level agencies when those decisions affect "vested" rights. (*Beverly Hills Fed. S. & L. Assn.* v. *Superior Court, supra;* Deering, California Administrative Mandamus (Cont. Ed. Bar) § 5.62.) ▋ The Board is such a nonconstitutional state-level agency. (*Garvai* v. *Board of Chiropractic Examiners*, 216 Cal.App.2d 374, 377 [31 Cal.Rptr. 187].)

In practice, the distinction between "vested" and "non-vested" rights has not provided the courts with a test of easy application. The Board suggests that one important criterion for determining whether or not a right is vested is whether the action of the administrative agency in taking away that right is quasi-legislative or quasi-judicial. If the action is quasi-legislative, argues the Board, this indicates that no vested right is involved. The Board contends that its conduct in establishing the requirements which an approved school must meet was quasi-legislative. With this position we agree. However, we are also of the opinion that when the Board applied its general rules to the particular facts before it in order to determine if Cleveland was in compliance with those rules, it performed a quasi-judicial act. As the court in *Wyatt* v. *Tahoe Forest Hospital Dist.*, 174 Cal.App.2d 709 stated (at p. 716) [345 P.2d 93]: ▋ "It is the general rule that where a board is empowered to ascertain facts on which may depend the right to engage in the practice of a profession, the board in exercising such power performs a quasi-judicial function."

Deering states that "the decisions draw a clear line between 'licensing' proceedings and 'disciplinary' proceedings." (Deering, *supra*, § 5.71.) According to his analysis, a licensing proceeding arises from an application for an initial license or permit to engage in a business or profession and no vested right is involved. On the other hand, "a vested right is affected when an agency revokes, suspends, or otherwise impairs an existing license or permit." (*Ibid;* see *Drummey* v. *State Board of Funeral Directors & Embalmers, supra*, 13 Cal.2d 75 and *McDonough* v. *Goodcell*, 13 Cal.2d 741 [91 P.2d 1035, 123 A.L.R. 1205].) We feel that the instant case is, for all intents and purposes, in the nature of a license revocation proceeding.

▋ "The word 'license' generally speaking, means a grant of permission to do a particular thing, to exercise a certain privilege, or to carry

on a particular business or to pursue a certain occupation." (*Blatz Brewing Co.* v. *Collins,* 69 Cal.App.2d 637, 643 [160 P.2d 37].)

 Cleveland and its predecessor, the Ratledge Chiropractic College, had been in business as an approved chiropractic college since 1911, prior to the adoption of the Chiropractic Act in 1922, and continued with a certificate of approval to date. Unless a chiropractic college is approved, its graduate cannot apply for a license to practice in California. (See § 5, Chiropractic Act.) Since withdrawal of approval would, for all practical purposes, force Cleveland to close, continued approval is tantamount to possession of a license, and withdrawal of that approval is tantamount to revocation of that license. (See *Wyatt* v. *Tahoe Forest Hospital Dist.,* 174 Cal.App.2d 709, 715 [345 P.2d 93].) Thus, a vested right is involved and the court below properly applied the independent judgment test. We note that Deering, in Appendix A of his treatise, also reaches the conclusion that the independent judgment test applies on review of a decision to withdraw approval of a chiropractic college.

 The court found that Cleveland was in compliance with section 331.7(e), which requires that brief descriptions of the library, audio-visual facilities,[3] laboratory and clinic facilities to be included in the college catalog. An addendum to Cleveland's catalog contained the following information concerning the library:

"Our Library has approximately 3000 volumes. We are expanding our Library facilities. Our Library classrooms are available for student use. The Library is open regularly for the use of both Day and Evening Division."

In the absence of more explicit requirements in section 331.7(e), we cannot say that this description of the library facilities is inadequate as a matter of law. The Board contends that this description is misleading because the library is only open from noon to 6 p.m. and therefore is not available to night students. However, as Dr. Towne (Associate Dean of Cleveland) testified, this was simply because night students could not use the library while in class; that they did have its use in the afternoon.

The laboratory and clinic were respectively described in the catalog as follows: "The college has ample facilities for laboratory instruction, for the students accepted, in such subjects as bacteriology, chemistry, pathology, histology, dissection and clinical laboratory analysis.

"The college has five different X-ray machines. In three laboratories particularly, we specialize in taking 36 inch spinographs (X-rays) of the entire

---

[3]No issue is raised as to inadequacy of this description in the catalog.

spinal column in either supine, erect or standing position. The college takes 36 inch spinal X-rays of every student and 36 inch X-rays are taken of all patients at standard reasonable rates. One X-ray apparatus is used mostly for demonstrating fluoroscopy.

"The Thompson Head Clamps and Thompson turntable are used in teaching the Upper Cervical Specific. One classroom is equipped with thirty-six inch X-ray interpretation boxes for reading 36 inch spinal X-rays."

"A teaching and research clinic is in operation daily, day or evening. Here, particular emphasis is laid to the adjustment of the entire spinal column according to 36 inch and other X-rays of the spinal column and pelvis.

"Our clinics are organized to give the student a knowledge of taking case histories, making examinations and tabulations. In order [*sic*] words, our clinic plan offers a complete, practical experience in the handling of actual patients under careful faculty supervision."

"Our clinics are equipped with Zenith-Hylo and other adjusting tables, X-ray laboratories, X-ray interpretation boxes, Consultation rooms, Thermoscribe, the facilities for making laboratory tests, etc."

In the absence of more explicit requirements in section 331.7(e), we agree with the trial court that these descriptions are also adequate.

■ The court rejected the Board's finding that Cleveland was in violation of section 331.7(f), which provides that no school shall be retained in good standing which publishes in its catalog any misrepresentation regarding its facilities for instruction. The Board contends that the following statement constitutes a misrepresentation: "Our clinics are organized to give the student knowledge of taking case histories, making examinations and tabulations. In order [*sic*] words, our clinic plan offers a complete practical experience in the handling of actual patients under careful faculty supervision."

The Board's argument that this statement constitutes a misrepresentation is based upon another Board finding rejected by the court, a finding that Cleveland was in violation of section 331.14(h), which provides that the college shall operate a general out-patient clinic where the senior students will obtain practical knowledge in (a) Diagnosis, which includes physical examination, spinal analysis, clinical pathological laboratory findings and X-ray, and (b) Adjustive technique. The Board contends that students do not receive practical experience in diagnosis and adjustive technique, and

that they do not make evaluations of the condition of patients or the effect of treatment. The Board also argues that Cleveland does not treat enough out-patients to provide each student with the opportunity of treating even one patient, and that many students get no experience other than giving adjustments to other students. Finally, the Board contends that the students get no experience with or understanding of the value of lateral-view X-rays.

The evidence supportive of the Board's contentions comes from the testimony of the three-man inspection team sent to Cleveland by the Board. There was contradictory testimony presented on behalf of Cleveland. Under the independent judgment test, as hereinbefore stated, the court was entitled to accept the latter testimony and reject the former. Moreover, the testimony of the inspectors was at times unclear and ambiguous. Dr. Poulsen, when asked how he learned that students were not permitted to take X-rays, stated: "Either Dr. Cleveland or Dr. Towne told me that, and I asked one of the students as well, and I was told that students were not permitted to take X-rays." Dr. Loyst, relating his observations of the clinic, stated: "Well, the clinic was supposed to be in session and there was, apparently, a Clinic Director that was observing—oh, it looked like a couple of patients that were being treated or adjusted—being adjusted, and there was two students, if I remember right, on each side watching the adjuster. There was one out in the hallway, and I asked him if he was a student or a patient, and he didn't answer. Later, he said he was a patient and then later he said he was a student. I didn't get his name." Dr. Gohl testified concerning statements made by Dr. Cleveland that students did not take care of a patient when the latter first came in: "Well, the reason that he stated at the time was that, to the effect that he didn't want to take a student to handle the patient *where there was a serious problem involved.* He wanted an instructor to take care of the patient first, and set the patient up right and then turn the patient over to the student." (Italics added.)

On behalf of Cleveland, Dr. Robert L. Culver, a former student and president of the International Chiropractor's Association of California, testified that he used X-ray machines when enrolled at Cleveland. Dr. Clarence Duane Jensen, a chiropractor, testified that he examined Cleveland's facilities and was of the opinion that at least one of the machines could take lateral-view X-rays. Dr. Vincent Joseph Surace, a recent graduate of Cleveland, testified that in his senior year he had examined and treated outside patients. He testified that he took courses in the operation of and personally operated X-ray machines while a student.

The Board contends that the court's finding was uncertain and

ambiguous because it only found that Cleveland was in "substantial" compliance with section 331.14(h). The Board argues that it cannot determine from this finding whether or not Cleveland meets the requirements of the rule. It also contends that the findings that the "evidence does not show that students get no experience other than giving adjustments to other students; that students do not have the opportunity to treat outpatients . . ." are ambiguous because they do not determine whether Cleveland treats enough patients to provide each student with the opportunity to treat at least one patient and because they do not determine whether many students get no such experience.

At the hearing before the Board on January 10, 1967, the Deputy Attorney General, attorney for the Board, stated: "I do not want to give them time to think here, but I think in except for a couple of areas the Board is not concerned with the precise details. They are concerned with *substantial compliance*. I think in most cases the rules are fairly clear, and I would hope that where they are not clear, the interpretation placed upon them today has clarified them." (Italics added.) In light of this statement, the court's finding that Cleveland was in "substantial compliance" with section 331.14(h) was perfectly proper. The court's subsequent remarks must be read in light of this finding, namely that there were enough patients to provide each student with the opportunity to treat at least one patient and that all students get experience other than giving adjustments to other students.

 Section 331.10(a) provides that the full-time equivalent student-faculty ratio shall be at least one faculty member to every 15 students enrolled in the school. The court found that Cleveland was in compliance with this rule. The Board found that during the term commencing in September 1967 only nine faculty members, not all of whom were full time teachers as defined in section 331.10(e),[4] were engaged in teaching at Cleveland, while not more than 180 students were enrolled in the school. It is agreed by both sides that there were 178 students enrolled at Cleveland at the beginning of the September 1967 term, and 164 students enrolled at the end. Thus, if compliance is required at the beginning of the term, Cleveland would have to have 12 full time teachers; if compliance is required only at the end of the term, Cleveland would have to have 11 full time teachers on its staff.[5]

---

[4] Section 331.10(e) provides: "A full-time teacher is one who devotes the major portion of his time to academic duties, with a minimum of thirty-eight (38) hours per week.

[5] In its brief, the Board contends that while 12 persons were engaged in actual teaching duties of one type or another during the September 1967 term, Cleveland

Section 331.9(g) requires that no faculty member shall carry a teaching load of more than 20 hours per week. The same section requires that a teacher must dedicate at least 18 hours per week to lecture preparation, counseling and scientific investigation. There is nothing in the Board's rules to prevent a teacher from devoting more than 18 hours per week to this latter activity and nothing to prevent him from teaching less than 20 hours per week. Reading sections 331.9(g) and 331.10(e) together, we see that a faculty member can maintain full-time status by combining any number of teaching and research-counseling hours together to total 38 per week, so long as not more than 20 are devoted to teaching and not less than 18 are devoted to research and counseling. Thus, the mere fact that some of the teachers at Cleveland taught less than 20 hours per week would not disqualify them from holding full time status, in the absence of a showing by the Board that the hours they devoted to research and counseling, when combined with their teaching hours, totaled less than 38 hours per week. While the inference could certainly be drawn that some members of the faculty did not devote 38 hours a week to the college, the court below, applying the independent judgment test, could properly draw the opposite inference. In a disciplinary proceeding, the administrative agency must prove the facts constituting the violation. (Deering, *supra*, § 5.23.) It was therefore the duty of the Board to prove that the teachers did not devote 38 hours per week to the college, rather than the duty of Cleveland to prove the opposite.

Thus, the fact that three members of Cleveland's faculty were full time students does not prevent the conclusion that they were also full time faculty members. There was testimony tha⸱ many, if not the majority, of Cleveland's students held down full time employment in addition to their studies. There is nothing to prevent their full time job from being that of a Cleveland faculty member. Section 331.9(c) permits a person without a Doctor of Chiropractic degree to teach at a chiropractic college if he holds a degree from an accredited college of arts and sciences. Two other members of the faculty only gave special lectures, but there was no evidence concerning the amount of time they devoted to research and class preparation. The same rationale applies to four other teachers who devoted from 10 to 20 hours a week to teaching but did not maintain regular office hours at Cleveland. We cannot say that the evidence does

only had the equivalent of five full-time faculty members. The Board bases its contention on the number of hours per week devoted to teaching by each of these faculty members, plus their designated office hours. It also points out that three faculty members were full-time students; two taught chemistry, and one was a laboratory assistant.

not, as a matter of law, support the court's conclusion that Cleveland maintained the proper student-faculty ratio.[6]

Section 331.13(c) requires that "classes shall be presented in a proper sequence so that the normal shall be presented first before the abnormal is to be considered. (i.e., the student must learn anatomy, chemistry and physiology before he is taught pathology and diagnosis.)" The court found that this "rule is vague and uncertain and therefore void; insofar as it is at all specific, the evidence shows that [Cleveland] is in compliance. Further, there appears to be no accepted definition of 'normal' versus 'abnormal' courses other than the fact that Respondent [the Board] considers anatomy, chemistry and physiology 'normal' courses, and pathology and diagnosis 'abnormal' courses. The rule has no relation to any rational basis for structuring the curriculum of chiropractic colleges, thus the rule itself is void. Further, this rule must not be so construed as to discriminate against a particular school of chiropractic thought, thus violating § 16 of the Chiropractic Art." In its trial brief to the court below, Cleveland stated, in regard to the Board's determination that it was in violation of section 331.13(c): "The actual findings of fact as opposed to the conclusions of law under this paragraph of [the Board's] findings are supported by evidence in the record. The total invalidity of the rule is shown under IV, *infra,* and has been previously discussed in dealing with [the Board's] violations of § 16 of the Chiropractic Act, *supra.*" In its brief on appeal, Cleveland nevertheless argues that it is in compliance with this rule insofar as it can be understood in that at least its introductory courses in chemistry, physiology and anatomy are given before pathology and diagnosis. Cleveland argues that 331.13(c) cannot be interpreted to mean that all courses in anatomy, physiology and chemistry must be presented prior to any courses in pathology and diagnosis. The Board argues that since Cleveland offers each course in its curriculum only once every seven terms, it is possible for a student to take courses dealing with the state of the body in a diseased, or "abnormal" state before taking basic courses dealing with the state of the body in a healthy, or "normal" state.

It is our conclusion that the trial court was correct in determining that 331.13(c) is unduly vague to the extent that the terms "normal" and "abnormal" remain undefined. Stedman's Medical Dictionary (21st ed.) 1966, defines normal as "1. Typical; usual; healthy; according to the

---

[6]Contrary to the contention of the Board, Cleveland did not "admit" in its trial brief that the student-teacher ratio was one to sixteen. It merely said that this ratio would *exist* if the two special lecturers were considered as half-time teachers. However, Cleveland never conceded this point.

rule or standard." The definition of abnormal is "not normal; differing in any way from the usual state, structure, or condition." While the position of courses such as anatomy, physiology, chemistry, pathology and diagnosis in this pattern may seem obvious, the position of such required courses as public health, hygiene, sanitation, obstetrics and gynecology (see § 331.13(b)) is far from clear. For example, in the definitions of the various subjects which follow the previously quoted portion of section 331.13(c) these latter subjects are treated as totally distinct from the subjects of diagnosis, pathology, anatomy, physiology, and chemistry.

Cleveland contends that section 331.13(c) and several other rules of the Board which it was accused of violating are influenced by section 302(a),[7] which defines the scope of chiropractic. Cleveland argues that section 302(a) impermissibly expands the scope of chiropractic in violation of the Chiropractic Act (see *Crees* v. *California State Board of Medical Examiners,* 213 Cal.App.2d 195 [28 Cal.Rptr. 621]) and asks this court to rule that it is invalid. It contends that as a result of 302(a), the Board requires instruction in matters which are not proper subjects for a school of chiropractic. We feel that it is not necessary to pass upon this point, or upon the contention that the Board's rules discriminate against a particular school of chiropractic thought. These issues have nothing to do with the instant case, which is concerned with compliance with the rules promulgated by the Board for approved schools, as well as the clarity and reasonableness of those rules. Whether or not the Board has an improper conception of the permissible scope of chiropractic, there is certainly nothing in the law which prohibits it from requiring that prospective chiropractors be instructed in areas which are beyond the scope of the chiropractor's competence. The Board can quite legitimately demand that a chiropractor know enough about a medical doctor's skills to recognize when a patient is in special need of those skills. (See *In re Hartman,* 10 Cal.App.2d 213, 217 [51 P.2d 1104].) Thus, while the

---

[7] Rule 302(a) provides: "The basic principle of chiropractic is the maintenance of structural and functional integrity of the nervous system. A duly licensed chiropractor may only practice or attempt to practice or hold himself out as practicing a system of treatment by manipulation of the joints of the human body by manipulation of anatomical displacements, articulation of the spinal column, including its vertebrae and cord, and he may use all necessary, mechanical, hygienic and sanitary measures incident to the care of the body in connection with said system of treatment, but not for the purpose of treatment, and not including measures as would constitute the practice of medicine, surgery, osteopathy, dentistry, or optometry, and without the use of any drug or medicine included in materia medica.

"A duly licensed chiropractor may make use of light, air, water, rest, heat, diet, exercise, massage and physical culture, but only in connection with and incident to the practice of chiropractic as hereinabove set forth."

court below decided that the first sentence of section 302(a) is invalid, we do not reach that issue.

The court found that Cleveland was in full compliance with that portion of section 331.13(c) which requires that laboratory teaching with actual student participation must be included in anatomy, dissection, histology, chemistry, physiology, bacteriology and pathology. In view of the court's direct statement that Cleveland was in full compliance with this rule, the Board's objection that this finding is ambiguous is not well founded.

In the absence of a more explicit definition of the word "participation," we find there was adequate evidence before the court below to support its finding that Cleveland was in full compliance with this portion of section 331.13(c).

Section 331.14(b)[8] provides that "[t]here should be separate offices for the dean and other officers." The court found that "while the offices at [Cleveland] are not excessively large, . . . the offices are adequate in number and size to provide for the offices required under this rule and that [Cleveland] is in compliance with this rule." The court's finding was worded in terms used in the section, and the Board contends that the court failed to pass upon the question of whether Cleveland was in compliance with all of that portion of section 331.14(b) which the Board contended was being violated. The court specifically found that the offices were adequate in number to comply with this rule, and its finding is therefore unambiguous. The evidence shows that there were three administrative offices at Cleveland; one for the dean, one for the secretary, and one for the president. In addition, there was an office for the clinic director which was used as an administrative office. Reading section 331.14(b) as a whole, its only requirement is that the administrative offices *shall* be adequate in number to provide for the efficient work of the college administration. It goes on to say that there *should* be separate offices for the dean and other officers, without making this a requirement. The court was entitled to conclude that the number of offices was ade-

---

[8]Section 331.14(b) provides: "The administrative offices shall be adequate in number and size to provide for the efficient work of the dean, manager, registrar and accounting staff.

"There should be separate offices for the dean and other officers.

"Space should be available for trustees' meetings and faculty conferences.

"The furnishings shall be serviceable and functional.

"There shall be sufficient typewriters, files, bookcases and office equipment to effectively manage the business of the school.

"There shall be fireproof storage for the safekeeping of valuable records and documents."

quate for the proper administration of the school. Moreover, section 331.14(b) is ambiguous. It could be interpreted to mean that there should be only two administrative offices, one for the dean, and one for the other officers.

 Section 331.14(c) provides that "classrooms shall be adequate in size and number to separately accommodate the graded classes (1st, 2nd, 3rd, and 4th year classes)." The section also states that "[t]hey should be located where there is quiet and freedom from interruption and distraction." The court held that Cleveland was in full compliance with this rule. The only evidence which suggested that the classes were not quiet consisted of the testimony of Dr. Poulsen, who stated in reference to the lower-division classroom: "It was an outside room and . . . — it was the front of the building—I am sure it was—which as you open the windows for ventilation, all of the noise would be from the—what boulevard is that, Olympic Boulevard? From the street, which is right outside." All that Dr. Poulsen said in effect was that if the windows were open, any noise would be from the street. There was no evidence that the windows were ever opened, or, that if they were, the sounds from the street would make the classroom unduly noisy.

While there were four classrooms at Cleveland, only two were actually being used for that purpose at the time of trial. The other two were devoted to other uses. Nevertheless, there is no requirement in the Board's rules that each of the four grades must be instructed separately. Nothing in the Board's rules prevents combination of the upper three classes for instruction, as is Cleveland's practice. In the absence of a specific rule to this effect, we must hold that Cleveland may properly combine its upper three classes and devote two of its classrooms to other purposes, so long as they are available should the Board require that each class be taught separately. The finding of the court below was therefore correct.

 The court found that Cleveland was in substantial compliance with section 331.14(d), which provides that the laboratories shall be adequately equipped for the practical work in nine listed courses, that there shall be sufficient microscopes to accommodate class sections and that the chiropractic technique laboratory shall be equipped with one chiropractic table for every four students in the class. The court also found that section 331.14(d) is extremely vague and furnishes no adequate or nonarbitrary standard to guide schools which seek to comply. As stated hereinabove, the finding that Cleveland was in "substantial" compliance is not ambiguous and the Board's objection of ambiguity is not well founded. The Board further contends that the finding is ambiguous because it deals with

the sufficiency of Cleveland's laboratories and microscopes for *class sections*, while the Board had contended they were insufficient for the *upper division*. However, the Board's own rule reads in terms of class sections, and we feel it was perfectly proper for the court to couch its finding in the language used. We need not pass upon the issue of whether section 331.14(d) is unduly vague because insofar as it is at all specific, there is sufficient evidence in the record for the court, applying the independent judgment test, to find that Cleveland was in compliance. The Board contends there was an inadequate number of microscopes for the 45 to 50 students in the upper division. Dr. Loyst testified that he saw 20 microscopes. This is not conclusive proof that this amount constituted the total number of microscopes in the school. In any event, we do not believe that it would be necessary for Cleveland to supply a microscope for every one of the upper division students in order to comply with the Board's rule. Without a more explicit rule, we cannot say that it would be improper to have merely enough microscopes to enable students to work in pairs. Moreover, there was testimony that laboratory classes were divided into sections, reducing the student-microscope ratio. This division is also relevant to the question of whether the laboratory is large enough to accommodate the typical laboratory class. The Board argues that since the division of the upper division into laboratory sections is not specified in Cleveland's catalog, Cleveland is guilty of another violation of section 331.14(d). However, Cleveland was not charged with violating this portion of the rule. Of course, the Board is entitled, after serving a bill of particulars pursuant to section 331.2(d), to demand that Cleveland correct this alleged infraction, but this matter is not relevant to the present appeal.

The Board contends that it was established that the technique class was not divided into sections, and the required ratio of students to chiropractic adjusting tables did not exist. However, there was no evidence, one way or the other, in regard to whether the technique class was divided into sections. As hereinabove stated, the Board had the burden of proving violations of its rules, and failed to demonstrate just how many students were present in a technique class. Thus, the court could properly conclude that Cleveland was in compliance with this portion of the rule.

Cleveland's catalog provides for an hour per week for laboratory work. The Board contends that since the upper division is divided, students can only receive a half hour's laboratory work each week and that this amount of time is inadequate for proper training. We initially note that there was testimony that even with the division, each student received an hour's

work in the laboratory each week. Moreover, in the absence of more explicit rules from the Board, we cannot say that the time allotted is inadequate.

The Board concedes that the evidence concerning the inadequacy of the laboratory equipment is not overwhelmingly in its favor. The court's finding that it was adequate was therefore proper.

Section 331.14(h) provides that the clinic in an approved college must have adequate space for the clinic director's office, for laboratories, sterilization and storage. It further provides that there must be separate lavatories for patients and staff. The court found that Cleveland was in compliance with this rule. It also found that section 331.14(h) was extremely vague and furnished no adequate or nonarbitrary standard for the guidance of an approved school. The Board concedes that the court's finding is correct insofar as the lavatories and the sterilization equipment are concerned. Without determining whether the requirement concerning adequate space for the clinic director's office is unduly vague, we find that insofar as it is at all explicit, there was sufficient evidence in the record for the court to determine that the 10-foot by 12-foot office was adequate.

 Although we conclude that the evidence supports the court's findings, we must direct it to modify its judgment. The court found that Cleveland was not in compliance with section 331.5, concerning the furnishing of balance sheets and profit and loss statements, and section 331.7(b), which requires that the school catalog show which courses are taught by which instructors. In its judgment, the court ordered Cleveland to comply with these orders. However, in an administrative mandamus proceeding, the court has no power to order the petitioner to comply with the rules. (*King* v. *Board of Medical Examiners,* 65 Cal.App.2d 644, 652 [151 P.2d 282]; Deering, *supra,* § 5.41.) It can only enter judgment commanding the respondent agency to set aside its decision and reconsider "the case in the light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law but the judgment shall not limit or control in any way the discretion legally vested in the respondent." (Code Civ. Proc., § 1094.5, subd. (e).)

Cleveland contends, and the court found, that the Board did not comply with section 331.2(d) of its rules, which provides that in the event an approved school fails to maintain the required standards, it will be warned, given a bill of particulars, and granted a reasonable time to make corrections. The court found that only six weeks were given to Cleveland to make corrections between the service of the "Statement of Causes for Removal of Petitioner as an Approved School" and the hearing which

resulted in revocation of approval. Since Cleveland was charged for the first time with 13 rule violations which had not been previously brought against it, the court determined that the Board did not grant a reasonable time as required by section 331.2(d). The Board challenges this finding, contending that Cleveland was on notice from April 15, 1966, when the first "Bill of Particulars" was sent to it. The Board also points to several meetings it had with representatives of Cleveland prior to the issuance of the "Statement of Causes." It argues that Cleveland in fact was under full notice of the charges against it long before the revocation hearing was held. In this appeal we feel it is unnecessary to decide whether the Board complied with section 331.2(d). The court found, and we agree, that Cleveland is in compliance with all but two of the Board's rules. As far as those two violations are concerned, Cleveland has been aware of its duty to take corrective action since June 30, 1968, the date of the judgment below. When this matter is returned to the Board for reconsideration in light of the court's judgment, Cleveland can hardly argue that it was prejudiced by any failure to give proper notice prior to the date of the original administrative hearing. It has had ample time since the date of judgment to take corrective measures.

The case is remanded with directions to the trial court to order the Board to reconsider the case in light of this opinion and the judgment of the trial court.

As so modified, the judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred.