[Civ. No. 17083. Third Dist. Aug. 17, 1978.]

49ER CHEVROLET, Plaintiff and Appellant, v.
NEW MOTOR VEHICLE BOARD, Defendant and Respondent;
DEPARTMENT OF MOTOR VEHICLES,
Real Party in Interest and Respondent.

**COUNSEL**

Richard E. Wilmshurst, in pro. per., for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Talmadge R. Jones and Robert L. Mukai, Deputy Attorneys General, for Defendant and Respondent and for Real Party in Interest and Respondent.

## OPINION

**PARAS, Acting P. J.**—With a perversity born of adversity, 49er Chevrolet (49er), an automobile dealer, has tried over the past four years to avoid a decision of this case on its merits. (See *49er Chevrolet v. Office of Administrative Procedure* (Apr. 1, 1977) 3 Civ. 15927 [unpub. opn.].) Even in this appeal in which the merits are finally before us, 49er manages to conceal its most potent arguments in a blizzard of constitutional mutterings about the contract clause. It need not have labored so mightily, for on the merits 49er will prevail.

49er appeals from a judgment of the Sacramento County Superior Court refusing to issue a writ of administrative mandamus (Code Civ. Proc., § 1094.5) to overturn a decision of the defendant New Motor Vehicle Board (Board). That decision affirmed a finding (and the accompanying penalty) of the real party in interest Department of Motor Vehicles (Department) that 49er had violated Vehicle Code section 11713, subdivision (g).

Two transactions of 49er led to the administrative action. The first, which we designate the "Hilmanofski-Johnson" transaction, involved a lease of a Chevrolet pickup by 49er[1] to Phillip Hilmanofski on September 20, 1973. 49er at all times was the vehicle's registered owner. On December 24, 1973, after receiving from the Department the 1974 vehicle registration renewal notice on the pickup, 49er charged $95 to the Hilmanofski lease account for the registration fee and billed the lessee accordingly; this was in accordance with the leasing contract. Hilmanofski, who on December 24, 1973, was delinquent in lease payments, paid the $95 to 49er and was credited therefor. Penalties for late payment of the 1974 fee would have accrued on February 4, 1974. On January 25, 1974, 49er paid it. Thereafter the lease continued in effect until sometime after March 20, 1974, when it was terminated and the pickup restored to the possession of 49er. On March 25, 1974, 49er sold it to Hubert and Juanita Johnson and collected $95[2] from them for the 1974 registration

---

[1]Plaintiff is a corporation whose legal name is 49er Chevrolet, Inc. It conducts its sales operation under the name "49er Chevrolet." It also conducts a leasing operation under the name "49er Lease." The Board and the Department would now have us treat 49er as two separate legal entities because of these two operations, even though the administrative law judge made an express finding, which they both approved, to the contrary. Needless to say we treat 49er as a single business entity whose sales and leasing operations are both within the Department's jurisdiction.

[2]The actual dollars added on the Hilmanofski-Johnson sale (and on the Cornwell-Enzi sale) exceeded by a minor amount the actual 1974 registration fee, because of a transfer fee and a "certificate of title" fee. No issue is made by either party as to these added charges.

fee. On April 24, 1974, this $95 was again credited to the still delinquent account of Hilmanofski.

The "Cornwell-Enzi" transaction originated with a lease of a Chevrolet station wagon to David C. and Bonnie Jean Truelson on May 23, 1972. The lessees' interest was assumed by Richard Cornwell in March 1973. On December 24, 1973, by which time Cornwell was in default, the 1974 registration fee of $52 was charged to the account and billed. It was not paid by Cornwell. Penalties would have accrued on February 4, 1974. 49er paid the fee on January 29, 1974. The lease was terminated sometime in April 1974, and on April 28, 1974, the vehicle was sold by 49er to "James Edward or Emil Albert Enzi" who were charged $52 for the 1974 registration fee. This amount was credited to the still delinquent Cornwell account on May 15, 1974.

49er's actions with respect to these transactions appear on their face quite innocuous and consistent with desirable business practice. We note particularly that in each case the principal user of the vehicle during 1974 (the buyer) paid the 1974 registration fee, that there was no duplication of payment, and that 49er did not derive any financial benefit to itself from the procedure;[3] in each case it credited the buyer's registration fee payment to the earlier lessee. Yet despite this apparent absence of misconduct, 49er found itself at odds with the Department. The cause of this was Vehicle Code section 11713, subdivision (g), which we are here called upon to interpret.

Prior to 1972, the statute provided: "It shall be unlawful and a violation of this code for the holder of any license issued under this

---

[3]It could be argued that 49er did obtain a financial benefit, because even though it credited the lessee's delinquent account in each case, it collected actual dollars from the buyer which it might not ultimately have collected from the lessee, thus enriching itself. This is nonsense. First, even though the Hilmanofski balance was yet unpaid in November 1975, the date of the administrative hearing, suit for its collection was then pending and we cannot assume that it has not been paid (there was no evidence relative to the Cornwell balance). Second, there is nothing to suggest a motivation by 49er to achieve such a result. Third, even if this occurred (we refuse to assume that everyone who becomes delinquent on an automobile lease ultimately files bankruptcy and/or does not pay what he owes), it would very simply have been an incident of the transaction's basic objective, to place the burden of the current year's registration fee on the person who actually uses the vehicle in that year. As a business entity, 49er was dealing in each case with two customers or consumers of its product, a lessee and a buyer. Each was entitled to an equal degree of fair treatment by 49er, which found itself with a choice as to which of the two should bear the financial burden of the 1974 registration fee (which burden, in view of 49er's contract with the lessee, would not be that of 49er in any event). We cannot fault 49er for selecting in each case the consumer who used the vehicle for the better part of the registration year.

article: . . . (g) To include as an added cost to the selling price of a vehicle, an amount for licensing or transfer of title of the vehicle, which amount is not due to the state *unless such amount has in fact been paid by the dealer prior to such sale."* (Italics added.)

So worded, the statute was enforced without any problem of interpretation in *Ralph Williams Ford* v. *New Car Dealers Policy & Appeals Bd.* (1973) 30 Cal.App.3d 494 [106 Cal.Rptr. 340]. In 1972, however, the Legislature rewrote the "unless" clause, to read: ". . . unless prior to the sale, such amount has been paid by a dealer to the state *in order to avoid penalties that would have accrued because of late payment of such fees."* (Italics added.)

The evil sought to be cured by the amendment is not readily apparent, and the parties have not been helpful to us in determining it. The Board and the Department did not address this question. 49er states that the change ". . . was made at the suggestion of the D.M.V. for the reason that a dealer who had two separate corporations was able to pay the fees in one corporation and then pass them on to the other corporation passed on to the retail buyer, . . ." This explanation is not satisfactory, for as 49er itself notes, there would be no inherent evil in such former procedure so long as the dealer in fact paid the fees to the Department and did not overcharge the buyer.

Of even less help to us is the interpretation of the present section 11713, subdivision (g), urged by the contending parties. 49er contends that whenever a registration fee is paid when due but before the penalty date, the payment is necessarily made to avoid a penalty and can thus be charged to the buyer; the Board and Department counter persuasively that under this interpretation all payments of fees could *always* be charged to the buyer precisely as provided by the statute before its amendment, thus making the amendment meaningless. The Board and Department on the other hand assert that regardless of when the registration fee is paid, its purpose is to enable the vehicle's possessor to operate it lawfully on the public streets and the avoidance of a penalty is purely a casual incident of this objective; to which 49er counters with much persuasiveness that under such an interpretation a dealer never pays the fee to avoid penalties, thus can never collect it from the buyer, with the result again that the amendment is meaningless.

We have tried with utmost diligence to determine the legislative purpose of and the evils sought to be corrected by the statutory change.

We cannot. Neither the legislative history nor any other legislative expression have been helpful. Accordingly, we interpret the current statute under the familiar and traditional rules that (1) a statute should be given a reasonable and commonsense construction, one that is practical rather than technical, and one that will lead to a wise policy rather than to mischief (45 Cal.Jur.2d, Statutes, § 116, pp. 625-626), (2) a penal statute[4] should be interpreted in a manner favorable to the accused (*ibid.*; § 160, pp. 662-663), and (3) a statute having the potential of bringing about the revocation of a license, in this case an automobile dealer's license (Veh. Code, § 11705), should be interpreted favorable to the licensee. (Cf. *Borror* v. *Department of Investment* (1971) 15 Cal.App.3d 531, 537 [92 Cal.Rptr. 525] [vested rights to real estate salesman's license]; *Cleveland Chiropractic College* v. *State Bd. of Chiropractic Examiners* (1970) 11 Cal.App.3d 25, 36-37 [89 Cal.Rptr. 572] [vested right to status of "approved school of chiropractic"]. "The portion of the [real estate broker's act] which authorizes the real estate commissioner to forfeit the license of a broker or salesman and take it away from him is highly penal in its nature, and should not be construed to include anything which is not embraced within its terms." (*Schomig* v. *Keiser* (1922) 189 Cal. 596, 598 [209 P. 550]; see also *Barron* v. *Board of Dental Examiners* (1930) 109 Cal.App. 382, 385 [293 P. 144].)) 49er was thus entitled to read section 11713, subdivision (g), in accordance with an interpretation to which it is reasonably susceptible and not to anticipate or be suspicious of abstruse meanings which might later be attributed to it. Accordingly, 49er or any other dealer would reason thus:

"Under the pre-1977 statute, I could lawfully charge a used car purchaser the amount of the current year's registration fee, so long as I had in fact paid it. On the other hand, if I had not paid it, as for example if I acquired the car on a trade-in and the fee already had been paid by the former owner and not by myself, I could not charge it to the purchaser. This makes sense, for in the former case I would be making myself whole by reimbursing monies I had actually expended; in the latter case if I collected the fee from the purchaser, it would be a fraud upon him, for he would pay it as a fee to the state when in reality I would take it as additional profit to myself.

"Now, however, the Legislature has changed subdivision (g) and it says that I can't charge my used car purchaser the current year's registration

---

[4]A violation of Vehicle Code section 11713, subdivision (g), is a misdemeanor (Veh. Code, § 40000.11).

fee even though I paid it unless I paid it 'to avoid penalties [for] late payment.' What does this mean? I could interpret it to mean that nothing has changed, since whenever I pay registration fees which are due but not yet delinquent, I avoid penalties which will ultimately be charged if they become delinquent. Yet I really can't justify that interpretation because the Legislature would not change a statute without desiring it to mean something to some extent at least different from what it was before the change. What the Legislature must truly mean is that in order for me to charge the fee to the purchaser, not only must I have actually paid it, but at the time of payment I must have consciously considered that unless I paid it a penalty would be incurred. Now in any case in which penalty is brought about by tardiness, I don't normally give conscious consideration to penalty unless the act which avoids it is very close to the day or the time when the penalty will actually come about. Therefore, from now on, if I wish to be in a position to add a registration fee paid by me to the price paid me by my used car purchaser, I must not pay it until shortly before the day a penalty will accrue.

"I admit that I cannot comprehend why the Legislature feels that things are better this way, but that is not my concern. This is the most sensible meaning I can give the amended statute."

■ The fees were paid to the Department 10 days (Hilmanofski-Johnson) and 6 days (Cornwell-Enzi) prior to the penalty date[5] and in both transactions 49er was neither using nor in possession of the vehicles at the time of payment. The avoidance of the penalty would have inured to the benefit of either the lessees (who were contractually obligated to pay them to 49er "as additional rental") or the buyers (to whom they undeniably could have been charged if unpaid at the time of sale), in no case to 49er (even though as registered owner it had the primary obligation to pay the fees (Veh. Code, § 4601 et seq.).) There is nothing to show that during the short period from repossession to sale 49er itself beneficially used the vehicles.[6] Thus the only conclusion justified by the record is that the fees in question were paid "to avoid penalties," as provided by the statute.

---

[5] The registration fees of all leased vehicles and all used vehicles in 49er's inventory were paid by 49er as a matter of normal business practice a few days prior to the date of penalty.

[6] In fact, even if the fees had not been paid at all, 49er could have operated the vehicles after repossession on dealer's special plates under Vehicle Code section 11715.

The only evidence of any other motive for payment of the fees by 49er arises from the following series of questions and answers elicited on cross-examination of 49er's agent, Patrick Ball:

"Q. Is the reason you pay fees is to avoid penalty?

"A. Yes.

"Q. It is not for the privilege of driving it on the highway? Isn't that why you pay the fees, Mr. Ball? Isn't it?

"A. I guess it is."

This in no way contradicts an intention to avoid penalty; at best it indicates a second reason for payment of the registration fee. ▮ There is nothing about section 11713, subdivision (g), which requires that avoidance of penalty be the *sole* reason for the payment; it is sufficient if such avoidance is a substantial reason. Similarly, in the Hilmanofski-Johnson transaction, even though Hilmanofski paid the amount of the fee to 49er pursuant to billing "as additional rental," it still was intended to be used for the fee. Thus 49er necessarily was motivated in part by the simple propriety of paying the fee because it had received the money for this purpose. That does not, however, negate the objective of avoiding penalty.

▮ The proximity of the payments to the date of penalty, the uncontradicted testimony as to the reason for the payments, and the totality of the circumstances, all convince us that 49er did not violate Vehicle Code section 11713, subdivision (g). Had the Legislature intended a more severe restriction upon collection of registration fees from buyers by dealers, it could have said so with clarity. As presently written the statute is not complicated, and as above interpreted brings about a commonsense result.[7]

---

[7]Our dissenting brother's analysis is remarkable. Without in any way relating his interpretation to the statutory change of language and to the key term "to avoid penalties," he reads section 11713, subdivision (g), as preventing "an unscrupulous dealer ... from deriving a higher profit from a purchaser." (Dis. opn., *post*, p. 94.) He then finds such a higher profit in the avoidance by 49er of a "risk of loss in the event the leasee should prove recalcitrant." (*Ibid.*)

Presumably then, if such a risk of loss does not exist and is not therefore avoided, there is no violation. So if at the time of lease termination Hilmanofski and Cornwell had fully paid their respective accounts to 49er, including license fees, and 49er had thereafter refunded their 1974 license fee payments in cash after collection thereof from Johnson and Enzi, such collection would not have brought about a "higher profit" and hence 49er

The above makes it unnecessary to discuss other contentions of 49er.

The judgment is reversed and the superior court is directed to issue a peremptory writ ordering the Department to vacate its decision and to conclude its administrative proceeding in a manner consistent with this opinion.

Evans, J., concurred.

**REYNOSO, J.**—I dissent. 49er Chevrolet (49er) has been found to have violated Vehicle Code section 11713, subdivision (g), as amended in 1972, which declares unlawful certain types of conduct by licensed dealers, manufacturers, and transporters of vehicles. While the majority fail to find a purpose for the 1972 amendment to section 11713, subdivision (g), I believe that the Legislature intended to provide further safeguards against a dealer's profiting by the addition of license and transfer fees to the purchase price of a vehicle.

In the interpretation of an act of the Legislature we must consider the policies and purposes of the act. The applicable rule of statutory construction is that the purpose sought to be achieved and evils to be eliminated have an important place in ascertaining the legislative intent. (*Freedland* v. *Greco* (1955) 45 Cal.2d 462, 476 [289 P.2d 463].) Statutes should be interpreted to promote rather than defeat the legislative purpose and policy, and construction of a statute which affords an opportunity to evade the act should be avoided in favor of construction which would defeat subterfuges, expediencies, or evasions employed to continue the mischief sought to be remedied by the statute, defeat compliance with its terms, or to accomplish by indirection that which the statute forbids. (*Id.,* at pp. 467-468.)

Vehicle Code section 11713, subdivision (g), is part of the Rees-Levering Motor Vehicle Sales and Finance Act, enacted in 1961 to replace and strengthen the Automobile Sales Act of 1945, which was considered ambiguous, incomplete, and which failed to provide sufficient

---

would not have violated section 11713, subdivision (g). We find it bizarre that violation vel non by a dealer, whose conduct alone the statute regulates, should hinge upon the actions of a third person.

That is the first absurdity in the dissent's interpretation. The second is that while the above may be an acceptable bit of consumer philosophy, it is totally unrelated to the avoidance of "penalties that would have accrued because of late payment of [license] fees."

incentives to promote compliance and thereby effect protection for purchasers of automobiles. (See 15 Assem. Com. Rep. (1961) No. 24, Final Rep. of the Assem. Interim Com. on Finance and Insurance, pp. 38-39, 1 Appen. to Assem. J. (1961 Reg. Sess.).) While the act dealt primarily with regulation of financing practices and improvement of available remedies for purchasers, other abuses, including disguised price mark-ups, were also prohibited.

The various sections of the act clearly indicate its consumer protection nature. For example, section 11713, subdivisions (a) and (k) prohibit forms of false advertising. Sections 11713.1 and 11713.2 forbid other forms of deceptive behavior. Section 11713.1, subdivision (b) is concerned with the advertised price of a vehicle, providing that it is unlawful "To advertise the total price of a vehicle without including all costs to the purchaser at time of delivery at the dealer's premises, except sales tax, vehicle registration fees, and finance charges." When section 11713, subdivision (g), is viewed as one portion of this broad remedial act the legislative intent becomes apparent. In substance we deal with a "truth in selling" statute designed to protect consumers.

In my view the interpretation of section 11713, subdivision (g), by the majority defeats its consumer protection purpose. The state exacts certain fees for the licensing and transferring of title of a vehicle. I believe it is the intent of section 11713, subdivision (g), to prevent an unscrupulous dealer, under the guise of a license or transfer fee, from deriving a higher profit from a purchaser. The dealer must make his profit from his quoted price, only the state is allowed to gain from a license or transfer fee. Under the facts of this case 49er, by charging the license fees over and above the agreed purchase price, profited by avoiding the risk of loss on its leases. In doing so 49er violated the statute. Nor can the subterfuge of crediting the license fees to the unpaid overdue leasee accounts avoid application of the section. 49er contracted with the leasees and in the process accepted the risk of loss in the event the leasee should prove recalcitrant. By charging the purchasers a license fee 49er avoided this risk of loss and thus profited to the extent of the charged fee. That this was 49er's motive in charging the fee is apparent from its argument before the board that it faced potential losses on both leases.

In my view, with the license fees to the state already paid, 49er could have sought recovery of the fees pursuant to its leases, and could have informed the purchasers of the repossessed vehicles that the fees had been paid for the year, thereby negotiating for a higher purchase price of

the vehicles. What it could not do was add the license fee to the agreed upon purchase price thereby implying to the purchasers that they were paying the state its due. In choosing the latter alternative 49er violated section 11713, subdivision (g).

A petition for a rehearing was denied September 12, 1978, and the petition of all the respondents for a hearing by the Supreme Court was denied October 12, 1978. Mosk, J., and Manuel, J., were of the opinion that the petition should be granted.