[S.F. No. 23349. In Bank. Mar. 4, 1976.]

AGRICULTURAL LABOR RELATIONS
BOARD et al., Petitioners, v.
THE SUPERIOR COURT OF TULARE
COUNTY et al., Respondents;
PANDOL & SONS et al., Real Parties in Interest.

**COUNSEL**

Walter L. Kintz, Jerrold C. Schaefer, Byron S. Georgiou, Ruth Friedman, Ronald Greenberg, Maurice Jourdane, Ellen Lake, Alberto Saldamando and Gustin L. Reichbach for Petitioners.

Dennis M. Perluss, Mark D. Rosenbaum, Fred Okrand, Daniel C. Lavery, Jill Jakes and Mary Ellen Gale as Amici Curiae on behalf of Petitioners.

No appearance for Respondents.

Seyfarth, Shaw, Fairweather & Geraldson, Joseph Herman, Michael J. Machan, Thomas, Snell, Jamison, Russell, Williamson & Asperger, Jay V. Jory, Littler, Mendelson & Fastiff, J. Richard Thesing, George J.

Tichy II, Jordan L. Bloom, Nancy L. Ober and Gary P. Scholick for Real Parties in Interest.

Jay W. Powell, District Attorney (Tulare), as Amicus Curiae.

OPINION

MOSK, J.—The state Agricultural Labor Relations Board (ALRB) petitions for an original writ of mandate to compel respondent Superior Courts of Tulare and Fresno Counties to vacate various orders enjoining enforcement of an administrative regulation which permits qualified access to agricultural property by farm labor organizers. We have concluded that the regulation is valid and the board is entitled to the relief requested.

On August 28, 1975, the Agricultural Labor Relations Act (ALRA) (Lab. Code, § 1140 et seq.) went into effect. The preamble to the act recites in part that "In enacting this legislation the people of the State of California seek to ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations. [¶] This enactment is intended to bring certainty and a sense of fair play to a presently unstable and potentially volatile condition in the state." (Stats. 1975, Third Ex. Sess., ch. 1, § 1, No. 3 West's Cal. Legis. Service, p. 304, No. 2 Deering's Adv. Legis. Service, p. 1147.)

To achieve this goal, the act declares the right of agricultural employees to organize themselves into unions and to engage in collective bargaining, free from intimidation by either employers or union representatives. Thus new section 1140.2 of the Labor Code states "the policy of the State of California" to be "to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, to negotiate the terms and conditions of their employment, and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. For this purpose this part

[i.e., the ALRA] is adopted to provide for collective-bargaining rights for agricultural employees."[1]

Remaining provisions of the act implement this legislative intent in two principal ways. First, chapter 4 characterizes a variety of acts by employers or unions as unfair labor practices. In particular, it is declared to be an unfair labor practice for employers to interfere in any way with the goal of self-organization by farm workers, to favor any union over another, to discriminate against any worker for asserting his rights under the statute, or to refuse to bargain in good faith with the certified representative union. (Lab. Code, § 1153.)[2]

Secondly, chapter 5 sets forth elaborate provisions for elections by secret ballot to determine the representative union for collective bargaining purposes. "Recognizing that agriculture is a seasonal occupation for a majority of agricultural employees" (§ 1156.4), the act authorizes such elections only during peak harvest seasons. An election will be held when a union obtains the signatures of the majority of the workers on a ranch; if a second union obtains the signatures of 20 percent of the same work force, it will also be placed on the ballot. The ballots are printed in English, Spanish, and any other language requested. Once authorized, an election is quickly held: within 48 hours in case of a strike, and within 7 days in other cases. Within five days thereafter any person may challenge the propriety of the election or its results. (§ 1156.3.)

Article 1 of chapter 2 creates the ALRB and prescribes its method of operation. Article 2 vests the board with broad investigatory powers, and makes it a criminal offense to interfere in the performance of the board's duties. Numerous provisions throughout the remainder of the act grant the board specific powers and responsibilities of administration, particularly in conducting and certifying elections and in investigating and preventing unfair labor practices. On the latter subject chapter 6 begins by declaring (§ 1160) that "The board is empowered . . . to prevent any person from engaging in any unfair labor practice" defined in the act, and succeeding sections authorize the board to use a variety of methods

---

[1]Section 1152 reaffirms that "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities. . . ." The quoted language is identical to that of section 7 of the National Labor Relations Act (NLRA). (Now 29 U.S.C. § 157.)

[2]The provisions of section 1153 are closely modeled on those of section 8 of the NLRA. (Now 29 U.S.C. § 158.)

to achieve that end: administrative complaint (§ 1160.2), cease and desist order (§ 1160.3), temporary restraining order (§ 1160.4), injunctive relief (§ 1160.6), and enforcement orders from both the superior courts and the Courts of Appeal (§ 1160.8).

In addition to its adjudicatory and executive powers, the board is vested with express legislative authority: section 1144 delegates to the board the power to make, amend, and repeal "such rules and regulations as may be necessary to carry out the provisions" of the ALRA.

The board promptly adopted emergency regulations for the operation of the act. (Cal. Admin. Code, tit. 8, pt. II, § 20100 et seq.) Among those provisions is the regulation here in issue, which grants a qualified right of access to growers' premises by farm labor organizers. (Cal. Admin. Code, tit. 8, pt. II, ch. 9, §§ 20900-20901, pp. 1051-1053.)[3] Under the terms of the regulation the right of access is specifically limited in purpose, in time and place, and in the number of organizers permitted to participate; and conduct is forbidden, other than speech, which is "disruptive of the employer's property or agricultural operations, including injury to crops or machinery."[4]

---

[3] The regulation took effect on August 29, 1975. An emergency regulation automatically expires 120 days after its effective date unless the agency certifies during that period that it has complied with certain requirements of notice and hearing. (Gov. Code, § 11422.1.) The ALRB so certified on December 2, 1975, and the regulation will therefore remain in effect until such time as it may be amended or repealed.

[4] The relevant portions of the regulation read as follows:

"5. Accordingly, the Board will consider the rights of employees under Labor Code Sec. 1152 [fn. 1, *ante*] to include the right of access by union organizers to the premises of an agricultural employer for the purpose of organizing, subject to the following limitations:

"a. Organizers may enter the property of an employer for a total period of 60 minutes before the start of work and 60 minutes after the completion of work to meet and talk with employees in areas in which employees congregate before and after working.

"b. In addition, organizers may enter the employer's property for a total period of one hour during the working day for the purpose of meeting and talking with employees during their lunch period, at such location or locations as the employees eat their lunch. If there is an established lunch break, the one-hour period shall include such lunch break. If there is no established lunch break, the one-hour period may be at any time during the working day.

"c. Access shall be limited to two organizers for each work crew on the property, provided that if there are more than 30 workers in a crew, there may be one additional organizer for every 15 additional workers.

"d. Upon request, organizers shall identify themselves by name and labor organization to the employer or his agent. Organizers shall also wear a badge or other designation of affiliation.

"e. The right of access shall not include conduct disruptive of the employer's property or agricultural operations, including injury to crops or machinery. Speech by itself shall not be considered disruptive conduct. Disruptive conduct by particular organizers shall

Two groups of growers, real parties in interest herein, filed actions in the Fresno and Tulare Superior Courts attacking the validity of the regulation and seeking to prevent its enforcement. The Fresno Superior Court held a hearing on the matter and on the same day issued a peremptory writ of mandate ordering the board to vacate the regulation, together with a declaratory judgment that the regulation is invalid on both constitutional and statutory grounds. At the same time the Tulare Superior Court issued a temporary restraining order prohibiting the board from enforcing the regulation, and set a hearing on an order to show cause why an injunction to that effect should not be issued. Upon application and appropriate showing by the board, we stayed the effect of the respective superior court rulings pending final determination of this proceeding for writ of mandate.

I

The remedy is proper. The challenged rulings of respondent courts are primarily injunctive in effect. The codes, embodying a settled principle of equity jurisprudence, prohibit the granting of injunctive relief "To prevent the execution of a public statute by officers of the law for the public benefit." (Code Civ. Proc., § 526, 2d subd. 4; Civ. Code, § 3423, subd. Fourth.) That rule is here applicable, inasmuch as a regulation adopted by a state administrative agency pursuant to a delegation of rulemaking authority by the Legislature has the force and effect of a statute. (*Zumwalt* v. *Trustees of Cal. State Colleges* (1973) 33 Cal.App.3d 665, 675 [109 Cal.Rptr. 344]; *Alta-Dena Dairy* v. *County of San Diego* (1969) 271 Cal.App.2d 66, 75 [76 Cal.Rptr. 510]; *Rigley* v. *Board of Retirement* (1968) 260 Cal.App.2d 445, 450 [67 Cal.Rptr. 185], and cases cited.) It is true the rule prohibiting such an injunction does not operate when the statute which is stayed is unconstitutional or otherwise invalid. (*Conover* v. *Hall* (1974) 11 Cal.3d 842, 850 [114 Cal.Rptr. 642, 523 P.2d 682].) As will appear, however, we have concluded that the access regulation is valid. Under the codes, therefore, respondent courts had no jurisdiction except to deny the real parties' request to enjoin enforcement of the regulation. (*City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 430 [333 P.2d 745], and cases cited.)

When a court's discretion can legally be exercised in only one way, mandate will lie to compel that exercise if there is no adequate

---

not be grounds for expelling organizers not engaged in such conduct, nor for preventing future access.

"f. Pending further regulation by the Board, this regulation shall not apply after the results of an election held pursuant to this act have been certified."

remedy at law. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].) ■ The absence of an adequate remedy at law was determined herein when we issued the alternative writ. (*Ibid.*) Accordingly, mandate is an appropriate remedy to compel respondent courts to vacate their orders invalidating and enjoining enforcement of the access regulation. (*People* v. *Superior Court* (1967) 248 Cal.App.2d 276, 282 [56 Cal.Rptr. 393].) And we exercise our original jurisdiction to grant that remedy (Cal. Const., art. VI, § 10) because we find that in the circumstances of this case " 'the issues presented are of great public importance and must be resolved promptly.' " (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 808 [114 Cal.Rptr. 577, 523 P.2d 617], quoting from *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].)

## II

■ We begin with the constitutional issues. The real parties in interest contend that the access regulation is unconstitutional because it assertedly deprives them of property rights without due process of law and constitutes a taking of those rights without just compensation. (Cal. Const., art. I, §§ 1, 7, subd. (a), and 19; U.S. Const., 5th and 14th Amends.) As will appear, however, the constitutional challenge comes many years too late.

The real parties principally rely on *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219], and *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460], but the decisions are not in point. In each a divided court held that the constitutional guarantee of free speech was not violated by the refusal of a shopping center to permit its property to be used for distribution of antiwar handbills *(Lloyd)* or solicitation of signatures on an initiative petition *(Diamond)*. The matter at bar, by contrast, is not primarily a First Amendment case. At issue here is not an exercise of freedom of speech on a topic of general concern in a convenient public forum; rather, the interest asserted is the right of workers employed on the premises in question to have effective access to information assisting them to organize into representative units pursuant to a specific governmental policy of encouraging collective bargaining. The inapplicability of the *Lloyd-Diamond* rule to labor disputes is noted on the face of each opinion *(Lloyd,* at pp. 560-561 [33 L.Ed.2d at pp. 137-138]; *Diamond,* at p. 334, fn. 3), and has been elsewhere emphasized by both the United States Supreme Court *(Central Hardware Co.* v. *NLRB* (1972) 407 U.S. 539, 545 [33 L.Ed.2d 122, 127-128, 92 S.Ct. 2238]) and this court *(United Farm Workers of*

*America* v. *Superior Court* (1975) 14 Cal.3d 902, 911 [122 Cal.Rptr. 877, 537 P.2d 1237]).

The governmental policy in favor of collective bargaining, as the above-quoted preamble to the ALRA makes clear, is designed to benefit the public as a whole. It should scarcely be necessary, as we enter the last quarter of the 20th century, to reaffirm the principle that all private property is held subject to the power of the government to regulate its use for the public welfare. We do not minimize the importance of the constitutional guarantees attaching to private ownership of property; but as long as 50 years ago it was already " 'thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires. As the interest of society justifies restraints upon individual conduct, so, also, does it justify restraints upon the use to which property may be devoted. It was not intended by these constitutional provisions to so far protect the individual in the use of his property as to enable him to use it to the detriment of society. By thus protecting individual rights, society did not part with the power to protect itself or to promote its general well-being. Where the interest of the individual conflicts with the interest of society, such individual interest is subordinated to the general welfare. . . . [I]ncidental damages to property resulting from governmental activities, or laws passed in the promotion of the public welfare are not considered a taking of the property for which compensation must be made.' " (*Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 488 [234 P. 381, 38 A.L.R. 1479], quoting from *Carter* v. *Harper* (1923) 182 Wis. 148, 153 [196 N.W. 451, 33 A.L.R. 269].) This is living law today. (*HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 515 [125 Cal.Rptr. 365, 542 P.2d 237].) And no different rights are conferred by the corresponding provisions of the federal Constitution. (See, e.g., *Nebbia* v. *New York* (1934) 291 U.S. 502, 523-527 [78 L.Ed. 940, 948-951, 54 S.Ct. 505, 89 A.L.R. 1469].)

Nor should we need to recall the corollary of the foregoing principle, to wit, that governmental power is not static but dynamic: it is not "confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public," but rather is "capable of expansion to meet existing conditions of modern life and thereby keep

pace with the social, economic, moral, and intellectual evolution of the human race." (*Miller* v. *Board of Public Works, supra,* at pp. 484, 485.) Early restraints on the unfettered use of private property—e.g., the doctrines of easement and nuisance—were few in number and narrow in scope. But modern social legislation has added many others—e.g., building codes, zoning restrictions, land use planning, and urban redevelopment—which are far more pervasive in their effect on the rights of property owners. Thus, an eminent authority on the law of property lists no less than 20 ways in which private property is today subject to governmental regulation (Powell, *The Relationship Between Property Rights and Civil Rights* (1963) 15 Hastings L.J. 135, 148-149), and concludes that "the history of the law of private ownership has witnessed simultaneously a playing-down of absolute rights and a playing-up of social concern as to the use of property. . . . Property rights have been redefined in response to a swelling demand that ownership be responsible and responsive to the needs of the social whole. Property rights cannot be used as a shibboleth to cloak conduct which adversely affects the health, the safety, the morals, or the welfare of others." (*Id.,* at pp. 149-150.)

The efforts for social justice documented in that history have precipitated many conflicts. In most the reasonable needs of the community as a whole have eventually prevailed. But in the general retreat of recalcitrant forces, a strange rearguard action has been fought by those property owners who are also employers of labor: "Though subject to reasonable use in other areas of the law, curiously the concept of property rights has become a rallying cry in the field of labor law. The traditional notion would seem to be that the concept suffices as an absolute defense against those who would engage in union activity. That notion—like so many others held as doctrine by past generations—may well be under increasing attack." (Gould, *Union Organizational Rights and the Concept of "Quasi-Public" Property* (1965) 49 Minn.L.Rev. 505, 509.)

The issue joined here is new to the California courts, but our federal brethren have often considered it in the industrial labor context.[5] "In *Republic Aviation Corp.* v. *Board* [(1945) 324 U.S. 793 (89 L.Ed. 1372, 65

[5]In other settings our courts have looked to federal decisions interpreting provisions of the NLRA similar to state law. (E.g., *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 687-689 [8 Cal.Rptr. 1, 355 P.2d 905]; *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88* (1960) 53 Cal.2d 455, 459-460 [2 Cal.Rptr. 470, 349 P.2d 76]; *International Assn. of Fire Fighters* v. *County of Merced* (1962) 204 Cal.App.2d 387, 392 [22 Cal.Rptr. 270].)

S.Ct. 982, 157 A.L.R. 1081)], the Supreme Court set forth the ground rules concerning union activity on company property." (Gould, *The Question of Union Activity on Company Property* (1964) 18 Vand.L.Rev. 73, 75.) The case dealt with organizational activities conducted on the employer's premises by union spokesmen who were also employees of the company. The high court ratified the position of the NLRB that absent extraordinary circumstances it is an unfair labor practice for the employer to prohibit such activities during nonworking hours. The court quoted with approval the following language of the decision of the board: " 'As the Circuit Court of Appeals for the Second Circuit has held, "It is not every interference with property rights that is within the Fifth Amendment . . . Inconvenience, or even some dislocation of property rights, may be necessary in order to safeguard the right to collective bargaining." [*National Labor R. Board* v. *Cities Service Oil Co.* (2d Cir. 1941) 122 F.2d 149, 152.] The Board has frequently applied this principle in decisions involving varying sets of circumstances, where it has held that the employer's right to control his property does not permit him to deny access to his property to persons whose presence is necessary there to enable the employees effectively to exercise their right to self-organization and collective bargaining, . . . ' " (*Id.,* at p. 802, fn. 8 [89 L.Ed. at p. 1379].)[6]

The second landmark case on this topic is *Labor Board* v. *Babcock & Wilcox Co.* (1956) 351 U.S. 105 [100 L.Ed. 975, 76 S.Ct. 679]. In contrast to *Republic Aviation,* the union organizers excluded from the employers' premises in the three consolidated cases decided in *Babcock & Wilcox* were not employees of the companies in question. The NLRB found that in the circumstances shown it was unreasonably difficult for the organizers to make contact with the employees off company property, and concluded that in denying the organizers permission to distribute union literature on company parking lots the employers had unlawfully interfered with the right of the employees to self-organization under the

---

[6]The reasoning in support of this conclusion was given in the court's quotation from an earlier NLRB decision in point (*Peyton Packing Company* (1943) 49 N.L.R.B. 828, 843-844), which said in part that "time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property. Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline." (324 U.S. at pp. 803-804, fn. 10 [89 L.Ed. at p. 1380].)

NLRA. The Supreme Court ruled that the board erred in failing to draw a distinction between employee and nonemployee organizers: access to company property by the latter can be denied, said the court, "if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message. . . ." (*Id.,* at p. 112 [100 L.Ed. at p. 982].)[7]

By declaring the foregoing standard the court necessarily rejected any claim that "property rights" of employers are paramount to their employees' right to have effective access to information assisting them in their goal of self-organization: "The right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others." (*Id.,* at p. 113 [100 L.Ed. at p. 983].) Rather, employers' property rights must give way whenever the two interests are found to be in irreconcilable conflict: "Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other. . . . But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." (*Id.,* at p. 112 [100 L.Ed. at pp. 982-983].) (Accord, *Central Hardware Co.* v. *NLRB* (1972) *supra,* 407 U.S. 539, 542-545 [33 L.Ed.2d 122, 125-128].)

Examples of the application of this rule appear in a variety of contexts. In *Republic Aviation* the court in dictum distinguished the case before it from those involving "a mining or lumber camp where the employees pass their rest as well as their work time on the employer's premises, so that union organization must proceed upon the employer's premises or be seriously handicapped." (Fn. omitted.) (324 U.S. at p. 799 [89 L.Ed. at p. 1377]; see also *Labor Board* v. *Stowe Spinning Co.* (1949) 336 U.S. 226, 232, fn. 10 [93 L.Ed. 638, 644, 69 S.Ct. 541].)

Shortly thereafter such a case arose. In *National Labor Rel. Bd.* v. *Lake Superior Lumber Corp.* (6th Cir. 1948) 167 F.2d 147, the employer

---

[7]A second condition imposed by the court—i.e., prohibiting discrimination against the union "by allowing other distribution"—is not involved in the case at bar.

The court concluded that on the record of each of the three cases before it the evidence did not support the board's finding of employee inaccessibility, and therefore declined to decree enforcement.

operated a number of lumbering camps on its timber tract. Each was isolated from any town, and was largely self-sufficient. The employees lived on the camp premises in bunkhouses; although given Sundays off, they usually remained in the camps. In these circumstances the NLRB ruled it was an unfair labor practice for the employer to bar nonemployee union organizers from entering the bunkhouses to talk with the men during nonworking hours. Enforcing the order of access, the Sixth Circuit Court of Appeals relied on the above-quoted dictum in *Republic Aviation* and held that "In view of the limited free time available to the employees and the practical difficulties involved in contacting them after the evening meal in any place other than in the bunkhouses, union organization would as a practical matter be seriously handicapped by restricting such activity to the recreation hall." (*Id.,* at p. 152.) (Accord, *Alaska Barite Company* (1972) 197 N.L.R.B. 1023 (mining camp on private island).)

Nor is the right of access limited to remote lumber or mining camps; it may attach in the case of a ship anchored in a busy port. Thus in *National Labor R. Board* v. *Cities Service Oil Co.* (2d Cir. 1941) *supra,* 122 F.2d 149, the employer operated ocean-going oil tankers which entered United States ports to discharge their cargo. A maritime union was refused passes to board the ships while in port for the purpose of negotiating grievances of the seamen. The NLRB ruled this practice violated the seamen's rights to self-organization and collective bargaining under section 7 of the NLRA. The Second Circuit Court of Appeals agreed, reasoning that "The result of refusing passes is undoubtedly to prevent the most effective sort of collective action by the employees. Ships, and particularly these oil tankers, which ordinarily remain in port for a day only, afford less opportunity for investigation of labor conditions than do factories where the employees go home every afternoon and have the evenings at their disposal. There is no cessation of work at the end of each day for seamen on a tanker. A large number of them are on watch, others are loading or discharging cargo; their hours for work and shore leave are different and, in the short time the vessel is in port, it is impossible for Union representatives to assemble the unlicensed personnel either on shore or on shipboard to discuss grievances or investigate conditions. The Union must have the members of the crew readily accessible in order to work to any real advantage . . . ." (*Id.,* at p. 151.) The court therefore granted enforcement of the board's order of access. (Accord, *Richfield Oil Corp.* v. *National Labor Relations Board* (9th Cir. 1944) 143 F.2d 860; *Sabine Towing & Transportation Co.* (1973) 205 N.L.R.B. No. 45; see also *National Labor Rel. Bd.* v. *National Organization, etc.* (7th Cir. 1958) 253 F.2d 66, 70.)

The same result has been reached on a showing of significantly less employee isolation than in the foregoing cases. In *N.L.R.B.* v. *S. & H. Grossinger's Inc.* (2d Cir. 1967) 372 F.2d 26, the employer operated a large rural resort hotel located only one and one-half miles from the nearest town. Sixty percent of the employees lived on the premises, but the remainder lived in neighboring towns and drove to work by car or taxi. The employer refused access to its premises by nonemployee union representatives, and the NLRB ruled this to be interference with the employees' right of self-organization. The federal circuit court observed that "No effective alternatives are available to the Union in its organizational efforts. The resident employees have no telephones in their rooms. Radio and newspaper advertising are expensive and relatively ineffectual. Moreover as far as radio is concerned, there was no single time at which a major proportion of employees would be off duty and free to listen to a message broadcast by the Union. . . . [¶] While some organization work can be done by employees who are willing to solicit fellow employees, it is obvious that lacking as they do the requisite special training and experience, they cannot convey the Union's appeal with anything like the effectiveness of professional union organizers." (*Id.,* at p. 29.)[8]

The court then quoted and applied the principles of *Babcock & Wilcox* as follows: "Here the majority of the employees live on the employer's premises. They cannot be reached by any means practically available to union organizers. As against these considerations Grossinger's raises only its proprietary interest. It shows no detriment that would result from the admission to its property of the Union's representatives under those reasonable regulations as to place, time and number which the Board's order contemplates.

"We will enforce the Board's order in so far as it requires [the employer] to permit nonemployee union organizers to come on its premises in order to solicit employees." (*Id.,* at p. 30.) (Accord, *H. & G. Operating Corp. (Raleigh Hotel)* (1971) 191 N.L.R.B. No. 110; see also *Fafnir Bearing Company* v. *N. L. R. B.* (2d Cir. 1966) 362 F.2d 716, 722 (company ordered to allow union to enter premises to conduct independent time studies).)[9]

---

[8] The court added that the union's attempts to reach the employees as they drove through the gates to the resort were ineffective because the cars did not stop there except briefly for a traffic light, and in any event it was difficult or impossible to distinguish between guests and employees in such circumstances.

[9] We recognize that other federal circuit court decisions have refused to enforce NLRB orders of access. (See, e.g., *N. L. R. B.* v. *Sioux City and New Orleans Barge Lines, Inc.*

Thus the rule of *Babcock & Wilcox,* both as enunciated and as applied, is clear: if the circumstances of employment "place the employees beyond the reach of reasonable union efforts to communicate with them, *the employer must allow the union to approach his employees on his property.*" (Italics added.) (351 U.S. at p. 113 [100 L.Ed. at p. 983].) This language could not be plainer. We deem it dispositive of the issue of the federal constitutionality of access to agricultural property under the challenged regulation of the ALRB (cf. *Petersen* v. *Talisman Sugar Corporation* (5th Cir. 1973) 478 F.2d 73, 79), and of the claim of invalidity premised on the cited provisions of the California Constitution. (Art. I, §§ 1, 7, subd. (a), and 19.) In the present context we construe those sections to guarantee no greater rights to California property owners than do their federal counterparts.

The only remaining question in this regard is whether it is *constitutionally* required that the determination of employee inaccessibility within the meaning of the *Babcock & Wilcox* test be made on a case-by-case basis, as the real parties urge, rather than by a rule of general application. As will appear, there is no authority for imposing such a requirement as a matter of constitutional law.

The question was not presented in either *Babcock & Wilcox* or *Central Hardware,* and the opinions are therefore silent on the point. The real parties rely on decisions holding that when a statute or regulation impairs a fundamental personal liberty, the state has the burden of showing that the measure is necessary to promote a compelling governmental interest (see, e.g., *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 638 [22 L.Ed.2d 600, 617, 89 S.Ct. 1322]; *Castro* v. *State of California* (1970) 2 Cal.3d 223, 234-236 [85 Cal.Rptr. 20, 466 P.2d 244]) and that there are no reasonable alternative means of accomplishing that goal (*Cleveland Board of Education* v. *LaFleur* (1974) 414 U.S. 632, 640-644 [39 L.Ed.2d 52, 60-63, 94 S.Ct. 791]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247]). ■ That well-known principle, however, is not applicable here: for the reasons stated at the outset, the access rule is not a deprivation of "fundamental personal liberties" but a limited economic regulation of the use of real property imposed for the public welfare. (Cf. *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 7-8 [39 L.Ed.2d 797, 803-804, 94 S.Ct. 1536].)

8th Cir. 1973) 472 F.2d 753; *N. L. R. B.* v. *New Pines, Inc.* (2d Cir. 1972) 468 F.2d 427; *N. L. R. B.* v. *Tamiment, Inc.* (3d Cir. 1971) 451 F.2d 794; *N. L. R. B.* v. *Kutsher's Hotel and Country Club, Inc.* (2d Cir. 1970) 427 F.2d 200.) But in each case the court found that on the record presented either the union had not made a reasonable effort to communicate with the employees or the alternative means of doing so were effective.

It has long been settled that such a regulation satisfies the due process clause if it has a reasonable relation to a proper public purpose and is neither arbitrary nor discriminatory. (*Nebbia* v. *New York* (1934) *supra,* 291 U.S. 502, 537 [78 L.Ed. 940, 957, 54 S.Ct. 505, 89 A.L.R. 1469]; accord, *Weinberger* v. *Salfi* (1975) 422 U.S. 749, 768-770 [45 L.Ed.2d 522, 540-542, 95 S.Ct. 2457], and cases cited.) In the light of *Babcock & Wilcox,* it cannot be said that an access regulation designed to assist self-organization by workers lacks a reasonable relation to a valid public goal; and a careful examination of the various limitations as to time, place, purpose, and manner which are written into this regulation (fn. 4, *ante*) demonstrates that it is neither arbitrary nor discriminatory within the meaning of the foregoing standards.

The principal objection of the real parties to the board's decision to proceed by way of rule rather than adjudication is that there will be individual instances in which access might in fact have been unnecessary in order to effectively communicate with the workers. This is inevitable, as the board candidly recognizes. But it does not follow therefrom that the regulation is unconstitutional. ▮ "In the area of economics and social welfare, the State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' [Citation.] 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' " (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 501-502, 90 S.Ct. 1153].) Moreover, "a classification that meets the test articulated in *Dandridge* is perforce consistent with the due process requirement of the Fifth Amendment." (*Richardson* v. *Belcher* (1971) 404 U.S. 78, 81 [30 L.Ed.2d 231, 235, 92 S.Ct. 254].)

It follows, as we have often had occasion to hold, that general economic regulations affecting property rights are not constitutionally invalid merely because they may be inappropriate in the case of a few individual property owners. (See, e.g., *Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 638-645 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847].) The entire law of zoning, from *Village of Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365, 388-389 [71 L.Ed. 303, 310-311, 47 S.Ct. 114, 54 A.L.R. 1016], to the present day, stands as witness to that fact of contemporary life. And it is a fundamental tenet of such law that if a zoning plan is reasonable vis-a-vis the community as a

whole, it is not rendered unconstitutional merely because certain property owners can show that it causes them unnecessary hardship. (*Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776, 787 [31 Cal.Rptr. 335, 282 P.2d 375]; *McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879, 890 [264 P.2d 932]; *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 338 [175 P.2d 542]; *Zahn* v. *Board of Public Works* (1925) 195 Cal. 497, 512 [234 P. 388].)

We conclude that the decision of the ALRB to regulate the question of access by a rule of general application transgresses no constitutional command.

### III

■ An administrative regulation, however, must also comport with various statutory prerequisites to validity. At the outset we take note of certain principles which govern our consideration of the matter; although these rules have been often restated, it would be well to remember that they are not merely empty rhetoric. First, our task is to inquire into the legality of the challenged regulation, not its wisdom. (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697].) ■ Second, in reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is "within the scope of the authority conferred" (Gov. Code, § 11373) and (2) is "reasonably necessary to effectuate the purpose of the statute" (Gov. Code, §. 11374).[10] Moreover, "these issues do not present a matter for the independent judgment of an appellate tribunal; rather, both come to this court freighted with the strong presumption of regularity accorded administrative rules and regulations." (*Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 444 P.2d 79].) And in considering whether the regulation is "reasonably necessary" under the foregoing standards, the court will defer to the agency's expertise and will not "superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision." (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83].)

■ The real parties in interest seek to overcome the presumption of regularity on several grounds. First, it is contended that in two respects

[10]A third inquiry—whether the regulation was adopted pursuant to proper procedure—is not an issue in this case.

the access regulation exceeds the authority of the board because it conflicts with the ALRA. The claim is not that the regulation contravenes any particular provision of the act expressly forbidding qualified access to agricultural property by union organizers—or declaring such entry to be an unfair labor practice—for no such provision exists. Rather, it is urged that the regulation violates the Legislature's *implied* intent to prohibit such access, assertedly manifested by both legislative action and inaction. Neither branch of the contention is convincing.

As noted earlier, article 1 of chapter 2 of the act prescribes the composition and general method of operation of the board; among its provisions is section 1148, which declares in its entirety that "The board shall follow applicable precedents of the National Labor Relations Act, as amended." The real parties stress the fact that it is the practice of the NLRB to decide questions of employee inaccessibility on a case-by-case basis rather than by general rule; when the ALRB adopted a contrary procedure, argue the real parties, it therefore violated section 1148.

The unstated major premise of this argument, however, is that in enacting section 1148 the Legislature impliedly intended the board to follow not only the substantive case law (i.e., the "precedents") interpreting the NLRA—holding, for example, that certain activities do or do not constitute unfair labor practices—but also the rules of procedure of the NLRB. ■ In our view the premise appears highly dubious. More importantly, the board could reasonably construe section 1148 otherwise, and that is our only concern: "In determining whether a specific administrative rule falls within the coverage of the delegated power, the sole function of this court is to decide whether the department reasonably interpreted the legislative mandate." (*Ralphs Grocery Co.* v. *Reimel, supra,* at p. 176 of 69 Cal.2d.)

■ Adverting first to the language of section 1148, we note that it directs the board to follow the "precedents" of the "Act," not the "procedure" of the "Board." The ALRB could reasonably have concluded that the choice of words was significant, and hence that the Legislature did not intend it to be bound by any particular rule of practice adopted by the federal agency to suit its own needs. This conclusion could well have been reinforced by the fact that the state act vests the board with full rulemaking authority in an earlier and different provision (§ 1144) which makes no reference to the practices of the NLRB. In addition, we observe that section 1148 directs the board to be guided by the "applicable" precedents of the NLRA, not merely "the

precedents" thereof. From this language the board could fairly have inferred that the Legislature intended it to select and follow only those federal precedents which are relevant to the particular problems of labor relations on the California agricultural scene. As we shall see, a case-by-case resolution of the question of access appears inappropriate in that context.

More importantly, in the absence of an express statutory directive to the contrary the board could also reasonably presume that the Legislature intended to abide by the well-settled principle of administrative law that in discharging its delegated responsibilities the choice between proceeding by general rule or by ad hoc adjudication "lies primarily in the informed discretion of the administrative agency." (*Securities Comm'n v. Chenery Corp.* (1947) 332 U.S. 194, 203 [91 L.Ed. 1995, 2002, 67 S.Ct. 1575]; accord, *PBW Stock Exchange, Inc. v. Securities and Exch. Com'n* (3d Cir. 1973) 485 F.2d 718, 732; *GTE Service Corporation v. F. C. C.* (2d Cir. 1973) 474 F.2d 724, 731; *Alabama-Tennessee Natural Gas Co. v. Federal Power Com'n* (5th Cir. 1966) 359 F.2d 318, 343 (Wisdom, J.); see generally Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy* (1965) 78 Harv.L.Rev. 921; Baker, *Policy by Rule or Ad Hoc Approach—Which Should it Be?* (1957) 22 Law & Contemp. Prob. 658.)[11] The real parties in interest fail to show that the ALRB abused its discretionary powers as a duly constituted administrative agency when it determined to proceed on this issue by way of a general rule rather than ad hoc adjudication.

A related argument is premised not only on section 1148 but also on section 1152 of the ALRA, emphasizing that the language of the latter which declares the right of farmworkers to organize and to bargain collectively is identical to that of section 7 of the NLRA. (See fn. 1, *ante.*) ▉ Reliance is then placed on the rule that "When legislation has been judicially construed and a subsequent statute on the same or an

[11]This principle applies equally well to the NLRB. (See, e.g., *NLRB v. Bell Aerospace Co.* (1974) 416 U.S. 267, 294 [40 L.Ed.2d 134, 153-154, 94 S.Ct. 1757].) That agency, however, has chosen to proceed on a case-by-case basis not only on questions of employee inaccessibility, but on essentially all issues within its competence. We note that the pervasive and long-standing reluctance of the NLRB to promulgate any rules or regulations whatever has been the subject of 'substantial and repeated scholarly and judicial criticism. . . ." (*Retail, Wholesale and Department Store U. v. N. L. R. B.* (D.C. Cir. 1972) 466 F.2d 380, 388; see *NLRB v. Wyman-Gordon Co.* (1969) 394 U.S. 759 [22 L.Ed.2d 709, 89 S.Ct. 1426]; Davis, Administrative Law Treatise (1970 Supp.) § 6.17; Bernstein, *The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act* (1970) 79 Yale L.J. 571; Peck, *The Atrophied Rule-Making Powers of the National Labor Relations Board* (1961) 70 Yale L.J. 729.)

analogous subject is framed in the identical language, it will ordinarily be presumed that the Legislature intended that the language as used in the later enactment would be given a like interpretation. This rule is applicable to state statutes which are patterned after federal statutes." (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) *supra,* 54 Cal.2d 684, 688-689.) From this premise it is reasoned that the Legislature must have intended that the board also follow the NLRB practice of ad hoc adjudication of the access issue.

We do not question the quoted rule of statutory construction, but in the circumstances of the case at bar it does not lead to the claimed conclusion. It may be posited that by adopting the language of section 7 of the NLRA the Legislature intended also to adopt the rule of *Babcock & Wilcox* and *Central Hardware* applying that language to the right of nonemployee labor organizers to enter an employer's premises for union purposes. But as we observed above, the question whether such a right of access should be resolved by regulation or by adjudication was not presented in either decision, and the opinions are accordingly silent on the matter. The teaching of *Babcock & Wilcox* and its progeny, rather, is simply that qualified access to an employer's premises must be granted when the circumstances of employment render ineffective the reasonable efforts of union representatives to communicate with the employees by alternative methods. (351 U.S. at p. 112 [100 L.Ed. at pp. 982-983].)

Far from ignoring this lesson, the ALRB predicated its access regulation on factual findings phrased in the very language of *Babcock & Wilcox.* Those findings disclose that the board did not adopt the NLRB practice on the access question because it determined that significant differences existed between the working conditions of industry in general and those of California agriculture. As we have seen, in regulating industrial labor disputes the NLRB has authorized access by union organizers to employers' premises when, for example, the same employees did not arrive and depart every day on fixed schedules, there were no adjacent public areas where the employees congregated or through which they regularly passed, and the employees could not effectively be reached at permanent addresses or telephone numbers in the nearby community, or by media advertising.

By contrast, the ALRB found that such conditions are the rule rather than the exception in California agriculture. The evidence heard by the board showed that many farmworkers are migrants; they arrive in town in time for the local harvest, live in motels, labor camps, or with friends

or relatives, then move on when the crop is in. Obviously home visits, mailings, or telephone calls are impossible in such circumstances. According to the record, even those farmworkers who are relatively sedentary often live in widely spread settlements, thus making personal contact at home impractical because it is both time-consuming and expensive.

Nor is pamphleting or personal contact on public property adjacent to the employer's premises a reasonable alternative in the present context, on several grounds. To begin with, many ranches have no such public areas at all: the witnesses explained that the cultivated fields begin at the property line, and across that line is either an open highway or the fields of another grower. Secondly, the typical industrial scene of a steady stream of workers walking through the factory gates to and from the company parking lot or nearby public transportation rarely if ever occurs in a rural setting. Instead, the evidence showed that labor contractors frequently transport farmworkers by private bus from camp to field or from ranch to ranch, driving directly onto the premises before unloading; in such circumstances, pamphleting or personal contact is again impossible. Thirdly, the testimony established that a significant number of farmworkers read and understand only Spanish, Filipino, or other languages from India or the Middle East. It is evident that efforts to communicate with such persons by advertising or broadcasting in the local media are futile. Finally it was also shown that many farmworkers are illiterate, unable to read even in one of the foregoing languages; in such circumstances, of course, printed messages in handbills, mailings, or local newspapers are equally incomprehensible.[12]

---

[12]Even in the industrial context the true effectiveness of "traditional" alternative methods of communicating with workers has been seriously questioned. Thus the Second Circuit Court of Appeals has observed that "The chances are negligible that alternatives equivalent to solicitation in the plant itself would exist. In the plant the entire work force may be contacted by a relatively small number of employees with little expense. The solicitors have the opportunity for personal confrontation, so that they can present their message with maximum persuasiveness. In contrast, the predictable alternatives bear without exception the flaws of greater expense and effort, and a lower degree of effectiveness. Mailed material would be typically lost in the daily flood of printed matter which passes with little impact from mailbox to wastebasket. Television and radio appeals, where not precluded entirely by cost, would suffer from competition with the family's favorite programs and at best would not compare with personal solicitation. Newspaper advertisements are subject to similar objections. Sidewalks and street corners are subject to the vicissitudes of climate and often force solicitation at awkward times, as when employees are hurrying to or from work." (*N. L. R. B.* v. *United Aircraft Corp., Pratt & Whitney Air. Div.* (2d Cir. 1963) 324 F.2d 128, 130.) Similar criticisms have been voiced in the legal literature. (See, e.g., Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act* (1964) 78 Harv.L.Rev. 38, 95-96; Gould, *The Question of Union Activity on Company Property* (1964) 18 Vand.L.Rev. 73, 99-100, 102-103.)

In addition, the problem here is compounded by the provisions of the ALRA which require swift elections—a difficulty not faced by the NLRB. In all cases involving crops with short harvest seasons, the union petitioning for the election has only a brief time in which to gather the necessary employee signatures. (Lab. Code, § 1156.3, subd. (a).) An intervening union will have even less time—at most 6 days—to obtain the signatures of 20 percent of the workers in order to qualify for the ballot. (*Id.,* subd. (b).) And both unions have only a few days thereafter to explain their positions to the workers. In such circumstances most of the channels of communication which have been used in organizing industrial laborers, and which were found sufficient in *Babcock & Wilcox* and its progeny, are simply too slow to be effective.[13]

On the basis of the foregoing evidence the ALRB formally found that "Generally, unions seeking to organize agricultural employees do not have available alternative channels of effective communication. Alternative channels of effective communication which have been found adequate in industrial settings do not exist or are insufficient in the context of agricultural labor." (Cal. Admin. Code, tit. 8, pt. II, § 20900, subd. 3, p. 1051.) From this finding—and in furtherance of the expressed intent of the framers of the act—the board concluded (*id.,* subd. 4) that "The legislatively declared purpose of bringing certainty and a sense of fair play to a presently unstable and potentially volatile condition in the agricultural fields of California can best be served by the adoption of rules on access which provide clarity and predictability to all parties. Relegation of the issues to case-by-case adjudication or the adoption of an overly general rule would cause further uncertainty and instability and create delay in the final determination of elections."

We conclude from the foregoing that the decision of the board to create a limited right of access by means of a detailed and specific regulation does not conflict with any intent of the Legislature inferable from its enactment of sections 1148 and 1152.

In this connection the real parties also contend that the regulation does not follow "applicable precedents" of the NLRA under section 1148 because the right of access it declares is assertedly not limited to nonworking areas. In support they rely on a passage from *Central*

---

[13]For example, the board heard testimony that although the home addresses of farmworkers can be obtained from the Department of Motor Vehicles on the basis of their automobile license plate numbers, the process takes an average of two weeks and costs $2 per name.

*Hardware Co.* v. *NLRB* (1972) *supra,* 407 U.S. 539, 545 [33 L.Ed.2d 122, 127], in which the court summarizes the rule of *Babcock & Wilcox* as authorizing access "limited to (i) union organizers; (ii) *prescribed nonworking areas of the employer's premises;* and (iii) the duration of organization activity." (Italics added.) The purpose of the emphasized limitation, presumably, is to prevent disruption of work. But the regulation here challenged achieves the same goal, although by a method more appropriate to the California agricultural setting in which the ALRB must operate.

As we have seen, there was evidence before the board that many ranches have no public or "nonworking" areas such as the parking lots of large factories. Responsive to this circumstance, the present regulation first authorizes access by farm labor organizers for a prescribed time prior to and at the close of the work day in "areas in which employees congregate before and after working." (Fn. 4, *ante.*) No more precise description is possible, as these areas will vary from ranch to ranch; in each instance, however, no disruption of work is permitted because the access is expressly limited to nonworking hours.

Secondly, and in further distinction to the typical industrial scene, California farm properties generally do not have cafeterias or lunchrooms where the employees assemble for their midday meal. Rather, in the case of row crops the workers frequently eat in or near their cars or the bus at the edge of the field, while in harvesting tree crops they often remain on the job site while they take their food and rest. Again responsive to these conditions, the regulation permits access for a prescribed time "at such location or locations as the employees eat their lunch." Although this description may include working areas in certain cases, access at all such locations is primarily restricted to the nonworking period of the "lunch break" and in any event the regulation expressly prohibits any disruption of "the employer's property or agricultural operations, including injury to crops or machinery." (Fn. 4, *ante.*) The regulation thus comports with the spirit if not the letter of the quoted language of *Central Hardware,* and cannot be deemed to contravene the asserted implication of section 1148.

■ Next it is contended that the access regulation conflicts with an implied intent of the ALRA derived not from a provision thereof but from the absence of such a provision. The real parties stress that one of the proposed farm labor bills which was *not* enacted into law (Assem. Bill No. 1 (1975-1976 Reg. Sess.)) contained a provision (§ 1149.3, subd.

(b)) expressly permitting access by farm labor organizers to employers' property, while the bill which finally became the ALRA (Sen. Bill No. 1 (1975 Third Ex. Sess.)) is silent on the point. This fact is said to reveal an unstated intent of the Legislature that no such access be permitted.

The contention is not persuasive. At best, "Legislative silence is a Delphic divination." (*Alabama-Tennessee Natural Gas Co.* v. *Federal Power Com'n* (5th Cir. 1966) *supra,* 359 F.2d 318, 333.) It is true that in two recent cases we have given weight to an argument superficially similar to that now advanced by the real parties. (*Cooper* v. *Swoap* (1974) 11 Cal.3d 856, 863-865 [115 Cal.Rptr. 1, 524 P.2d 97]; *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) *supra,* 11 Cal.3d 801, 817-818.) But in the circumstances which led to the passage of the ALRA, the reasoning of those decisions is inapposite.

This was not the *Cooper* situation, in which the Legislature rejected three successive attempts to add a certain provision to a welfare bill which thereafter became law, and the agency administering the ensuing statute nevertheless adopted a regulation "reviving" that provision. Nor is *Clean Air* relevant, for in that case an administrative agency charged with promptly adapting a certain antipollution program declined to do so even after the Legislature itself considered and rejected no less than five proposals to order or permit a delay.

In the case before us there was no such sequence: in this respect Senate Bill No. 1 was not merely an amended version of Assembly Bill No. 1, but an entirely new approach. Indeed, when the bills are closely compared it becomes apparent that the absence of a specific access provision in Senate Bill No. 1 is, if anything, an indication that the Legislature intended to adopt rather than reject the access principle. Assembly Bill No. 1 contained a number of proposed sections declaring various rights and duties derived from NLRA precedents, including a specific right of access. Senate Bill No. 1, however, adopted a different technique: instead of listing the substance of NLRA precedents individually as did Assembly Bill No. 1, it simply incorporated them by reference via section 1148. Thus the omission in Senate Bill No. 1 of any of the foregoing provisions of Assembly Bill No. 1 was a natural consequence of the legislative device employed; and rather than being of negative significance, the statutory history now stressed by the real parties can plausibly be taken to mean that the Legislature affirmatively intended to adopt the access principle of *Babcock & Wilcox* as herein defined.

Lastly it is urged that the access regulation violates yet another rule discussed in *Clean Air* (11 Cal.3d at p. 816): "An unconstitutional delegation of power occurs when the Legislature confers upon an administrative agency the unrestricted authority to make *fundamental policy determinations.* [Citations.]" (Italics added.) Again the present case is distinguishable. In *Clean Air* the "fundamental policy determination" by the agency was to totally reverse a clearly established legislative priority of pollution-free air—and environmental protection generally—over concern for increased gasoline consumption. In the cases cited in *Clean Air* on this point (*id.,* at pp. 816-817), administrative decisions of similar magnitude were involved.

In the case at bar the "fundamental policy determination" was made by the Legislature when that body decided, after much study and discussion, to grant to agricultural workers throughout California the rights of self-organization and collective bargaining so long denied to them under federal law. Seen in the perspective of that momentous decision, the board's qualified access provision appears much less important than the real parties would have us believe. As a regulation which in essence merely implements one aspect of the statutory program—the holding of secret elections—it does not amount to a "fundamental policy determination" within the meaning of the quoted rule.

## IV

Taking a different tack, the real parties contend the access regulation is invalid because it assertedly conflicts with the general criminal trespass statute. (Pen. Code, § 602.) The contention fails largely for reasons we have already explored.

It is settled that "Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government." (*Morris* v. *Williams* (1967) *supra,* 67 Cal.2d 733, 737.) Nor is the motivation of the agency relevant: "It is fundamental that an administrative agency may not usurp the legislative function, no matter how altruistic its motives are." (*City of San Joaquin* v. *State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374 [88 Cal.Rptr. 12].)

The doctrine has been most frequently invoked to strike down administrative regulations in conflict with the statute which created the agency or which the agency is authorized to administer. (See, e.g., *California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237, 242-243 [113 Cal.Rptr. 154, 520 P.2d 970]; *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 680-681 [94 Cal.Rptr. 279, 483 P.2d 1231]; *California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal.3d 139, 143-144 [89 Cal.Rptr. 620, 474 P.2d 436].) But the principle is equally applicable when the regulation contravenes a provision of a different statute. (See, e.g., *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449]; *Tolman* v. *Underhill* (1952) 39 Cal.2d 708 [249 P.2d 280]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1964) 228 Cal.App.2d 1 [39 Cal.Rptr. 192].)

On the other hand, it is no less settled that when a special and a general statute are in conflict, the former controls. (Code Civ. Proc., § 1859.) " '[T]he special act will be considered as an exception to the general statute whether it was passed before or after such general enactment.' " (*In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593]; accord, *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479-480 [82 Cal.Rptr. 724, 462 P.2d 580], and cases cited.) This rule of construction is reiterated and specifically made applicable to the ALRA in section 1166.3, subdivision (b), of the act, which states: "If any other act of the Legislature shall conflict with the provisions of this part [i.e., the ALRA], this part shall prevail."

If the Legislature can thus depart from its existing dispositions on a given topic, it can authorize an administrative agency to do so on its behalf. Accordingly, in cases of conflict a regulation validly adopted pursuant to a delegation of authority under a special statute likewise prevails over the terms of a general statute. The Legislature can surely accomplish indirectly that which it could do directly.

The access rule here challenged is such a regulation. For the reasons stated at length hereinabove, the incorporation in section 1152 of the language of section 7 of the NLRA, together with the express direction in section 1144 that the board make regulations necessary to carry out the act and in section 1148 that it follow applicable NLRA precedents, at least mean that the Legislature intended the board to structure a qualified right of entry onto agricultural property for organizational purposes. The access regulation was adopted as an expression of that intent. It therefore prevails over the general trespass statute, by operation

of both the foregoing rule of statutory construction and the specific directive of section 1166.3, subdivision (b). No act in compliance with the access regulation can be punished as a criminal trespass. (See *In re Zerbe* (1964) 60 Cal.2d 666 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840].)

Let a peremptory writ of mandate issue as prayed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**CLARK, J.**—I dissent.

The access regulation of the Agricultural Labor Relations Board is invalid on three grounds. First, federal law has established that nonemployee organizers have no right of access to an employer's property whenever other reasonable means of communication are available. Even when access is permissible, it is restricted to nonworking areas. The California Agricultural Labor Relations Act of 1975 (Lab. Code, § 1140 et seq.) incorporated the federal law; the board's regulation, in authorizing access when other means of communication are available, and in permitting access to working areas, is contrary to federal law and therefore violates the state statute. Second, because the board's regulation is in conflict with the penal trespass statute it usurps the legislative function, and is thus invalid. Third, the regulation constitutes an unwarranted infringement on constitutionally protected property rights.

THE REGULATION CONFLICTS WITH THE AGRICULTURAL LABOR RELATIONS ACT

A. *The Federal Law*

Two United States Supreme Court decisions have specifically dealt with the issue of nonemployee union organizer access to private property. In *Labor Board* v. *Babcock & Wilcox Co.* (1956) 351 U.S. 105 [100 L.Ed. 975, 76 S.Ct. 679], employers prohibited nonemployees from distributing union literature on employer-owned parking lots. The National Labor Relations Board (labor board) ruled that the employers' conduct constituted an unfair labor practice. The labor board based its ruling on a decision establishing that *employees* could use nonworking areas of the employer's premises for organizational activities. (*Republic Aviation Corp.* v. *Board* (1945) 324 U.S. 793 [89 L.Ed. 1372, 65 S.Ct. 982, 157 A.L.R. 1081].)

The court in *Babcock* unanimously ruled that the labor board had erred in failing "to make a distinction between rules of law applicable to employees and those applicable to nonemployees." (351 U.S. at p. 113 [100 L.Ed. at p. 983].)

Having identified the source of the labor board's error, the Supreme Court stated the legal principles which govern nonemployee access cases. "[A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution. In these circumstances the employer may not be compelled to allow distribution even under such reasonable regulations as the orders in these cases permit." (351 U.S. at p. 112 [100 L.Ed. at p. 982].)

In *Central Hardware Co.* v. *NLRB* (1972) 407 U.S. 539 [33 L.Ed.2d 122, 92 S.Ct. 2238], the second United States Supreme Court decision, the labor board again found an employer to have engaged in an unfair labor practice by excluding nonemployee union organizers from its parking lot. In making this ruling, the labor board decided that the employer had violated First Amendment rights of the employees under *Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601].

The Supreme Court reversed, ruling that *Logan Plaza's* First Amendment analysis was inapplicable, and that if the labor board's attempt to apply *Logan Plaza* to nonemployee organizers were allowed to stand, it would "constitute an unwarranted infringement of long-settled rights of private property protected by the Fifth and Fourteenth Amendments." (407 U.S. at p. 547 [33 L.Ed.2d at p. 129].)

The Supreme Court reiterated its *Babcock* holding that nonemployee organizers may not be allowed access when other reasonable means of communication are available. The court added: "The principle of *Babcock* is limited to this accommodation between organization rights and property rights. This principle requires a 'yielding' of property rights only in the context of an organization campaign. Moreover, the allowed intrusion on property rights is limited to that necessary to facilitate the exercise of employees' § 7 rights.[1] After the requisite need for access to

---

[1]Section 7 of the National Labor Relations Act is substantially identical to Labor Code section 1152.

the employer's property has been shown, the access is limited to (i) union organizers; (ii) prescribed nonworking areas of the employer's premises; and (iii) the duration of organization activity. In short, the principle of accommodation announced in *Babcock* is limited to labor organization campaigns, and the 'yielding' of property rights it may require is both temporary and minimal." (407 U.S. at pp. 544-545 [33 L.Ed.2d at p. 127].) The dissent in *Central Hardware* did not relate to the points involved here. Even the dissenting justices expressly stated that the labor board should have followed *Babcock.*

The federal law of nonemployee access is therefore settled, establishing that there is no right of access where alternative methods of communication exist. If there are no alternative methods, the nonemployees' right of access is limited to prescribed nonworking areas of the employer's premises. The Supreme Court has expressly held that the broader right of *employees* to engage in organizational activities recognized by *Republic Aviation* v. *Board, supra,* 324 U.S. 793, does not apply to the nonemployee organizer. *Employee* organizers are legally upon the employer's premises as employees; thus, their presence usually does not interfere with the employer's property rights. The employer's interest in securing effective work is the only interest subject to potential interference. Accordingly, the limitation on employees' right to organize relates to discipline. Nonemployee organizers, however, are not invited on the premises. In this situation, not only is the employer's interest in securing effective work jeopardized, but his property rights under the United States Constitution are interfered with as well.

B. *The Legislature's Incorporation of the Federal Law*

Labor Code section 1152 establishes the right of employees to organize. That section contains language identical to section 7 of the National Labor Relations Act,[2] the section applied in *Babcock* and *Central Hardware.* Labor Code section 1148 states: "The board *shall* follow *applicable precedents* of the National Labor Relations Act, as amended." (Italics added.)

"When legislation has been judicially construed and a subsequent statute on the same or an analogous subject is framed in the identical language, it will ordinarily be presumed that the Legislature intended

[2]The operative language of section 1152 is identical to section 7. The only difference between the statutes is that section 7 cross-references to another federal statute while section 1152 cross-references, of course, to a state statute.

that the language as used in the later enactment would be given a like interpretation. This rule is applicable to state statutes which are patterned after the federal statutes. [Citations.]" *(Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689, [8 Cal.Rptr. 1, 355 P.2d 905].)

In *Los Angeles Met. Transit Authority,* as in the instant case, the Legislature had used language from section 7 of the National Labor Relations Act. This court held that, because the federal courts had interpreted part of the language to include the right to strike, the Legislature intended to grant a right to strike despite the fact that the state statute applied to governmental employees who ordinarily have no such right.

By using the language of section 7, the Legislature clearly manifested its intention to adopt the federal construction of section 7. In *Babcock* and *Central Hardware,* the United States Supreme Court construed section 7. That construction was therefore adopted by our Legislature when it enacted section 1152. Any doubt in the matter was eliminated when the Legislature, in section 1148, expressly required the board to follow applicable federal precedents. Accordingly, the inescapable conclusion is that the Legislature intended the board to apply the rule of *Babcock* and *Central Hardware,* which denies access rights to nonemployee organizers when reasonable alternative methods of communication are available.[3]

It is generally recognized that the Agricultural Labor Relations Act of 1975 is a compromise among the various interests. (Levy, *The Agricultural Relations Act of 1975—La Esperanza de California Para El Futuro* (1975) 15 Santa Clara Law. 783.) When the competing interests agreed to compromise, the Legislature was faced with three choices: it could turn the board loose with little definition of its duties, powers, limitations on

---

[3]The majority attempts to characterize the access regulation as "limited in purpose, in time and place, and in the number of organizers . . . ."*(Ante,* p. 400.) But in characterizing these as limitations, the majority relies on the irrelevant. These limitations in no way indicate the unavailability of alternative means of communication—the very showing that must be made before any access, regardless of how limited, is permitted. Moreover, the majority's statement that elections under the ALRA are required to be held within short periods of time *(ante,* p. 416), while true, has nothing to do with the access regulation. The elections must be held within seven days of the filing of a petition signed by a majority of the currently employed. (Lab. Code, § 1156.3, subd. (a).) However, the access regulation does not limit access to the period following the filing of a petition. The regulation is thus open-ended and the infringement on property rights it sanctions— contrary to the majority's implication—is therefore neither limited in time nor is it minimal.

those powers, or standards to be applied; it could, on the other hand, sharply define the duties, powers, limitations, and standards; or it could incorporate the highly developed federal law, which had over a period of 40 years arrived at definitions of both the rights and interests of the affected parties, as well as the duties, powers, limitations, and standards of the administrative agency.

The Legislature chose to incorporate the highly developed federal law. This is clear from its adoption of section 1152, which is substantially identical to section 7 of the National Labor Relations Act, and adoption of section 1148, which requires the board to rely on applicable federal precedents.

The majority, of course, is not unmindful of the necessity to resort to federal law. There is no specific mention of a right of access in the act (other than for board officials) and no express delegation empowering the board to adopt a right of access. The majority, in finding a right of access, relies upon sections 1148 and 1152, which adopt federal law, and section 1144 which grants general rule-making powers to the board. Obviously, a general rule-making power with no specification as to what those rules relate is not the same as an express power to create access rights. It is evident that the majority must resort to federal law to find board authority to create access rights.

It is manifestly unfair to the Legislature, in light of the history and language of the act, to rely on federal law to establish board power to create an access right, and at the same time to ignore the standards and limitations placed upon that right by the same federal law. Rather, the Legislature's incorporation of the federal law includes the duties, powers, limitations, and standards.

Although the board is given general rule-making power, regulations adopted pursuant to this power must conform to the legislative command requiring application of federal law. As this court stated in *Morris* v. *Williams* (1967) 67 Cal.2d 733 [63 Cal.Rptr. 689, 433 P.2d 697]: "Under Government Code section 11373, 'Each regulation adopted [by a state agency], to be effective, must be within the scope of authority conferred. . . .' Whenever a state agency is authorized by statute 'to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, *no regulation adopted is valid or effective unless consistent and not in conflict with the statute. . . .*' (Gov. Code, § 11374.) Our first duty, therefore, is to determine whether the Administrator

exercised quasi-legislative authority within the bounds of the statutory mandate. While the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight, nevertheless 'Whatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts.' (*Whitcomb Hotel* v. *California Emp. Com.* (1944) 24 Cal.2d 753, 757 . . . , and authorities there collected.) Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations. (*Whitcomb Hotel* v. *California Emp. Com., supra; Hodge* v. *McCall* (1921) 185 Cal. 330, 334 . . .; *Boone* v. *Kingsbury* (1928) 206 Cal. 148, 161-162 . . .; *First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 550 . . .; see *Brock* v. *Superior Court* (1938) 11 Cal.2d 682, 688 . . . .)" (67 Cal.2d at p. 748.)

## C. *The Regulation's Conflict With the Federal Law and the Statute*

As we have seen, the federal law incorporated in the act by the Legislature denies access to nonemployee organizers whenever reasonable alternative means of communication are available. Further, even when access is allowed, it is restricted to nonworking areas. By permitting blanket access to all agricultural property, regardless of the existence of alternative means of communication, and by permitting access to working areas, the board's regulation is contrary to *Babcock* and *Central Hardware,* violating the statutory command to follow federal precedent.

The conflict may not be avoided on the basis of the board's finding that "[g]enerally" there is no alternative means of communication. The absence of alternative means of communication in *most* cases does not relieve the board of its obligation to adhere to *Babcock* and *Central Hardware* any more than an N.L.R.B. finding of the availability of alternative means of communication in *most* cases would justify the N.L.R.B. from denying nonemployee access in all cases.

CONFLICT WITH TRESPASS STATUTE

Penal Code section 602 provides in relevant part: "Every person who willfully commits a trespass by any of the following acts is guilty of a misdemeanor: (j) Entering any lands, whether unenclosed or enclosed by fence, for the purpose of injuring any property or property rights or with

the intention of interfering with, obstructing, or injuring any lawful business or occupation carried on by the owner of such land, his agent or by the person in lawful possession. [¶] (k) Entering any lands under cultivation or enclosed by fence, belonging to, or occupied by, another . . . without the written permission of the owner of such land, his agent or the person in lawful possession, and [¶] (1) Refusing or failing to leave such lands immediately upon being requested by the owner of such land, his agent or by the person in lawful possession to leave such lands, . . . [¶] (*l*) Entering and occupying real property or structures of any kind without the consent of the owner, his agent, or the person in lawful possession thereof. [¶] (m) Driving any vehicle . . . upon real property belonging to or lawfully occupied by another and known not to be open to the general public, without the consent of the owner, his agent, or the person in lawful possession thereof. [¶] (n) Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by a peace officer and the owner, his agent, or the person in lawful possession thereof."

The conflict between the access regulation and the trespass statute is apparent.

The law regarding conflict between administrative acts and legislative acts is well-settled. "*Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them.* They must conform to the legislative will if we are to preserve an orderly system of government." (*Morris* v. *Williams, supra,* 67 Cal.2d 733, 737; italics added.) "It is fundamental that an administrative agency may not usurp the legislative function, no matter how altruistic its motives are." (*City of San Joaquin* v. *State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374 [88 Cal.Rptr. 12].)

Administrative agencies "may not exercise [their] sublegislative powers to modify, alter or enlarge the provisions of the legislative act which is being administered. Administrative regulations in conflict with the Constitution or statutes are generally declared to be null or void. (*Hammond* v. *McDonald,* 49 Cal.App.2d 671, 679 . . .; *Hodge* v. *McCall,* 185 Cal. 330, 334 . . . .)" (*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1964) 228 Cal.App.2d 1, 6 [39 Cal.Rptr. 192]; Accord: *Morris* v. *Williams, supra,* 67 Cal.2d 733, 748-749; *Duskin* v. *State Board of Dry Cleaners* (1962) 58 Cal.2d 155, 161-162 [23 Cal.Rptr. 404, 373 P.2d 468]; *Schenley*

*Industries, Inc.* v. *Munro* (1965) 237 Cal.App.2d 106, 111 [46 Cal.Rptr. 678]; *Am. Distilling Co.* v. *St. Bd. of Equalization* (1942) 55 Cal.App.2d 799, 805-806 [131 P.2d 609].)

As the court in *Harris* v. *Alcoholic Bev. etc. Appeals Bd., supra,* noted: "The order of priority with respect to jurisdiction, accordingly, is as follows: (1) The Constitution is the supreme expression; (2) to the extent that it does not conflict with the Constitution, the Legislature may act; (3) to the extent that it does not conflict with the Constitution, *or with lawful acts of the Legislature,* the department [administrative agencies] may act through its rules and regulations." (228 Cal.App.2d at p. 7; italics added.)

The doctrine that administrative regulations are subordinate and must give way to legislative enactments is equally applicable when the regulation contravenes a provision of a statute or code other than the statutes creating the agency or administered by it. (*Tolman* v. *Underhill* (1952) 39 Cal.2d 708, 712 [249 P.2d 280]; *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734, 737-738 [227 P.2d 449]; *In re Potter* (1913) 164 Cal. 735, 739 [130 P. 721]; *Cleveland Chiropractic College* v. *State Bd. of Chiropractic Examiners* (1970) 11 Cal.App.3d 25, 34-35 [89 Cal.Rptr. 572]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 228 Cal.App.2d 1, 6.)

The Legislature, as the majority points out, may make exceptions to other statutes and may expressly authorize an administrative agency to make exceptions. Such exceptions may also be made by the incorporation of other law, including federal law. In addition, an agency's right to make an exception to general statutory provisions might be implied in cases of necessity, when exercise of a power expressly granted to the agency will necessarily involve a violation of the other statute. In these circumstances, exceptions are warranted by the general principle that specific statutory provisions govern general ones. (Code Civ. Proc., § 1859; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479-480 [82 Cal.Rptr. 724, 462 P.2d 580].)

However, the special-general principle does not apply when the agency's power to act is not express but merely implied. Because the agency's power is implied, it can never be special in relation to a conflicting express legislative declaration. If the rule were otherwise, agencies in their field of expertise would be free to ignore almost all statutes enacted by the Legislature.

The Legislature has not expressly provided for access by nonemployee organizers to employer property. Nor has the Legislature expressly delegated to the board the authority to formulate an access rule. Having refused to follow *Babcock* and *Central Hardware* and the federal law, the majority may not properly claim that the Legislature incorporated an access rule by reference to federal law. Nor has the board or the majority shown it to be absolutely necessary to sanction violations of the Penal Code in order to effectuate the powers expressly granted to the board.

The Agricultural Labor Relations Act deals with labor relations; it does not deal with trespasses to real property. Penal Code section 602 deals with trespass to real property; its relevant provisions do not expressly deal with labor relations. The instant case deals with labor relations *and* trespasses. Thus each *statute* is on par with the other, and the Penal Code provision being a legislative enactment, it must take precedence over the administrative regulation based on a power implied from the labor statute. Moreover, if either the act or the Penal Code provisions must be categorized as special in relation to the activities before us, the Penal Code provisions should be so categorized. Related provisions of the Penal Code expressly deal with both trespasses and labor relations (Pen. Code, §§ 552.1, 555.2), and in *In re Zerbe* (1964) 60 Cal.2d 666, 668-669 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840], it was held that the provisions of those sections must be read into section 602, subdivision (*l*), one of the subdivisions presently before us.

### CONSTITUTIONALITY OF THE ACCESS REGULATION

The majority concludes that the access regulation is constitutional and does not impinge upon private property rights because a rational relationship exists between the access regulation and the purposes of the act. The majority finds that the rational relationship test is the proper standard for constitutional review by analogizing the issue here presented to the issues raised when the validity of a zoning ordinance is challenged. The majority, however, has erred in its analogy, applied an improper standard of constitutional review, and thereby sanctioned an impermissible invasion on constitutionally protected property rights.[4]

---

[4]The majority justifies its application of the rational relationship test on grounds that the access regulation's infringement of property rights is "not a deprivation of 'fundamental personal liberties.'" However, property rights are fundamental and personal. As the United States Supreme Court pointed out in *Lynch* v. *Household Finance Corp.* (1972) 405 U.S. 538 [31 L.Ed.2d 424, 92 S.Ct. 1113], "[T]he dichotomy between personal liberties and property rights is a false one. Property does not have rights. People have rights. The right to enjoy property without unlawful

When regulations such as zoning are challenged, the constitutional issue raised is the extent to which the government may regulate *a landowner's use* of his own property. The access regulation, on the other hand, presents a very distinct situation. In promulgating such a regulation the government is requiring a property owner to surrender the use of his private property not for public use but *for the use of other private parties*—nonemployee union organizers.

The distinction is of major significance. In the private access situation we must weigh the strength of the interest asserted against the infringement on private property rights. The proper judicial function is to balance the competing interests; although the rational relationship test applies in zoning cases, the law of zoning is not a universal solvent in which property rights are dissolved.

This court is apparently the only court unable to grasp that the appropriate standard for review is one of balancing and not of rational relationship. In *Labor Board* v. *Babcock & Wilcox Co., supra,* 351 U.S. 105, the United States Supreme Court stated: "This is not a problem of always open or always closed doors for union organization on company property. . . . *Accommodation* between the two [organizational rights and property rights] must be obtained with as little destruction of one as is consistent with the maintenance of the other." (*Id.,* at p. 112; italics added.) Similarly, in *Central Hardware Co.* v. *NLRB, supra,* 407 U.S. 539, the Supreme Court stated: "the *principle of accommodation* announced in *Babcock* is limited to labor organization campaigns, and the 'yielding' of property rights it may require is both temporary and minimal." (*Id.,* at p. 545; italics added.) The proper test is one of balancing, not a determination of rational relationships.

The federal Courts of Appeals have fully recognized that balancing is the proper standard for review. (E.g., *N. L. R. B.* v. *Visceglia* (3d Cir. 1974) 498 F.2d 43, 45; *McDonnell Douglas Corporation* v. *N. L. R. B.* (8th Cir. 1973) 472 F.2d 539, 544; *Diamond Shamrock Co.* v. *N. L. R. B.* (3d Cir. 1971) 443 F.2d 52, 56-58; see *Asociacion de Trabajadores, Etc.* v.

---

deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized. J. Locke, Of Civil Government₂82-85 (1924); J. Adams, A Defense of the Constitutions of Government of the United States of America, in F. Coker, Democracy, Liberty, and Property 121-132 (1942); 1 W. Blackstone, Commentaries 138-140." (*Id.,* at p. 552 [31 L.Ed.2d at pp. 434-435].)

*Green Giant Co.* (3d Cir. 1975) 518 F.2d 130, 135; *Petersen* v. *Talisman Sugar Corporation* (5th Cir. 1973) 478 F.2d 73, 82.)

Indeed, in the only federal Court of Appeals case decided after *Babcock* and *Central Hardware* specifically discussed by the majority, the court recognized that the proper standard for resolving this issue is one of balancing. (*N. L. R. B.* v. *S & H Grossinger's Inc.* (2d Cir. 1967) 372 F.2d 26, 29-30.) Moreover, the fact that access has been permitted in several federal cases is hardly surprising under a balancing test. However, it does not follow, as the majority suggests, that because the balance in some cases has favored access that the balance in all cases will do so. If this were otherwise then the United States Supreme Court's use of the word "accommodate" is meaningless, as is the federal Courts of Appeals' continual use of a balancing approach.

The United States Supreme Court balanced the competing interests in *Babcock* and *Central Hardware,* and because, as pointed out above, the board's regulation violates the rule of those cases, the access regulation violates the constitutional provisions protecting private property. The board's regulation does not even attempt to balance or accommodate the competing interests. It allows access when alternative means of communication do in fact exist. And it permits blanket entry onto private property during working hours. The regulation as presently promulgated is unconstitutional.

CONCLUSION

In a case such as this, where conviction and feeling run high, we should apply the law to the facts carefully and objectively, to assure that the result of our decision comports with precedent, thereby carrying out the intent of the Legislature. In this, the majority has failed today. To reach its result, it has relied on inapplicable precedent, applied the wrong constitutional standard of review, nullified the Legislature's mandate to the board, and subordinated the Legislature to an administrative agency.

McComb, J., and Richardson, J., concurred.

On March 31, 1976, the opinion was modified to read as printed above.